Robert Monte **PRICHARD**, Appellant

v.

The **STATE** of Texas

NO. PD-0712-16

Court of Criminal Appeals of Texas.

FILED: June 28, 2017

Rehearing Overruled August 23, 2017

---

Catherine Clare Bernhard, Red Oak, TX, for appellant.

Stacey M. Soule, State Prosecuting Attorney, Austin, TX, for The State.

## OPINION

Alcala, J., delivered the opinion of the Court in which Keasler, Richardson, Newell, and Walker, JJ., joined.

This case addresses whether a deadly weapon finding is permissible for the use or exhibition of a deadly weapon against a nonhuman. In his petition for discretionary review, Robert Monte Prichard, appellant, argues that a deadly weapon finding is improper when the only thing injured or killed as a result of a defendant's criminal conduct is an animal rather than a human being. Rejecting that argument, the court of appeals upheld a deadly weapon finding in this case in which appellant was convicted of animal cruelty and the deadly force was directed only against a dog. *See Prichard v. State*, No. 05-14-01214-CR, 2016 WL 1615641, at *1 (Tex. App.—Dallas April 20, 2016) (mem. op., not designated for publication). We conclude that the language of the deadly weapon statute is ambiguous with respect to whether a deadly weapon finding may be made for weapons used or exhibited against nonhumans, and thus, we must consider extra-textual factors to discern the Legislature's intent as to this matter. We determine that an analysis of those factors supports our determination that a deadly weapon finding may be made for human victims only. We, therefore, we reverse the judgment of the court of appeals.

## I. Background

While purportedly disciplining his pet dog, appellant killed her by repeatedly hitting her head with a shovel and then drowning her in a swimming pool. He was indicted for the state-jail felony of cruelty to a non-livestock animal. *See* Tex. Penal Code § 42.092(b)(1), (c). In a separate paragraph, the indictment also alleged that the shovel and pool water, singly or in combination, constituted the use of a deadly weapon in the commission of the offense.[1] A jury convicted appellant of the offense as charged in the indictment and, in a special issue in the verdict form, made

---

1. The indictment alleged that appellant did "intentionally or knowingly cause unjustifiable pain or suffering or in a cruel manner kill an animal, to wit: a dog, by striking it on the head with a shovel or by drowning it in a pool of water, singly or in combination, And it is further presented that the defendant used a deadly weapon, to-wit: a shovel or water, singly or in combination."

a finding that appellant had used a deadly weapon. This finding made the state-jail felony offense punishable within the punishment range for a third-degree felony. *See id.* § 12.35(c). The jury sentenced appellant to six and one-half years' imprisonment. The trial court's judgment reflected that appellant had been convicted of a third-degree felony and the judgment showed an affirmative finding of a deadly weapon.

On appeal, appellant argued that the evidence was insufficient to support the jury's deadly weapon finding because that finding should be limited only to human victims and no evidence showed that a human had been harmed or placed at risk of harm as a result of appellant's conduct. Appellant challenged the deadly weapon finding primarily based on three theories.

First, appellant asserted that, although the statutory definition of a "deadly weapon" does not specifically address "the death or serious bodily injury' *of a person*," a common-sense reading of the statute implies that it applies only to people. He argued that interpreting "death or serious bodily injury" as including nonhumans would lead to absurd consequences not intended by the Legislature, such as deadly weapon findings for a reckless driver who runs over someone's pet snake or pet rat or hits a tree knocking off branches or leaves. The court of appeals did not perform any statutory analysis to decide if the plain language permitted a deadly weapon finding in this case, nor did it respond to appellant's absurd-results argument. The court of appeals generally rejected this argument by explaining that, because appellant did not dispute that his use of the shovel and pool water caused the dog's death as he intended, the deadly weapon special issue had been properly submitted and the evidence was sufficient to support the deadly weapon finding. *Prichard*, 2016

WL 1615641, at *2-3. The court concluded that the "pertinent inquiry with respect to whether a deadly weapon was *used*, the issue here, is whether the weapon achieved or facilitated the intended result." *Id.* at *2 (emphasis original).

Second, appellant argued that permitting a deadly weapon finding for death to a nonhuman would result in transforming what the Legislature had designated as a state-jail-felony offense of cruelty to animals into a third-degree felony. The court of appeals rejected this argument by explaining that the punishment range for the offense would remain a state-jail felony if the death or serious bodily injury of an animal was committed by omission. *Id.*

Third, appellant suggested that this Court's precedent already limits a deadly weapon finding to situations involving injury or death to humans only. The court of appeals reviewed this Court's precedent and determined that it was silent as to the inclusion or exclusion of nonhumans for deadly weapon findings. *Id.*

After rejecting appellant's arguments, the court of appeals reformed the trial court's judgment to reflect that appellant had actually been convicted of a state-jail felony, as opposed to a third-degree felony, and that he had pleaded not true to the deadly weapon allegation. *Id.* at *3. After modifying appellant's judgment, the court of appeals affirmed his conviction. *Id.*

In his petition for discretionary review, appellant reasserts his three arguments that he made to the court of appeals that contend that a deadly weapon finding may be made only when the use or exhibition of the deadly weapon is against a human victim. First, he argues that it "defies a common-sense reading of the statute to assume that 'deadly weapon' findings can apply to all living things." He suggests that to permit a deadly weapon finding in this case would result in absurd conse-

quences, such as permitting a deadly weapon finding in a felony DWI case when a defendant runs over someone's pet snake or pet rat, or in a felony criminal mischief case for causing the death of a tree. Furthermore, conceding that many people consider dogs as family members, appellant notes that dogs are nonetheless considered property in Texas and should not be equated with human victims.

Second, appellant also repeats his prior arguments that permitting a deadly weapon enhancement functionally makes animal cruelty a third-degree felony rather than, as the Legislature intended, a state-jail felony. He also contends that permitting a deadly weapon finding renders superfluous a section of the animal cruelty statute that enhances punishment for repeat offenses. *See* Tex. Penal Code § 42.092(c).

Third, although he acknowledges that this Court has never expressly addressed whether a deadly weapon finding must be limited to offenses involving humans, appellant suggests that this Court's precedent implies that limitation. In response, the State argues that the plain text of the definition of "deadly weapon" is broad enough that it permits a deadly weapon finding for serious bodily injury or death to animals. The State also maintains that the court of appeals properly rejected appellant's arguments on their merits.

## II. Analysis

Appellant's sufficiency challenge turns on the legal meaning of the deadly weapon statute. Factually, appellant does not contest that, if the law permits a deadly weapon finding under these circumstances, the evidence is sufficient to show that he used a deadly weapon against an animal. To resolve whether a deadly weapon finding may be made for a weapon used or exhibited against a nonhuman, we begin by construing the statutory language according to the rules of statutory construction. Applying those rules, we determine that the statutory language is ambiguous with respect to whether it applies to nonhuman victims. It is, therefore, necessary to examine extra-textual considerations to ascertain the Legislature's intent. That examination leads us to our conclusion that the Legislature did not intend to permit a deadly weapon finding for injury or death to a non-human.

## A. Applicable Law for Sufficiency of Evidence to Support Deadly Weapon Finding

 To conduct a sufficiency review, we examine the statutory requirements necessary to uphold the conviction or finding. *Liverman v. State*, 470 S.W.3d 831, 836 (Tex. Crim. App. 2015). We determine the meaning of statutes *de novo. Id.* When we interpret enactments of the Legislature, "we seek to effectuate the collective intent or purpose of the legislators who enacted the legislation." *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991) (internal citations omitted). We focus our analysis on the literal text of the statute and "attempt to discern the fair, objective meaning of that text at the time of its enactment." *Id.* "[I]f the meaning of the statutory text, when read using the established canons of construction relating to such text, should have been plain to the legislators who voted on it, we ordinarily give effect to that plain meaning." *Id.* Thus, we apply the plain meaning of a term if the statute is clear and unambiguous. *Id.* In determining the plain meaning of a statute, courts read words and phrases in context and construe them according to the rules of grammar and common usage. *Yazdchi v. State*, 428 S.W.3d 831, 837 (Tex. Crim. App. 2014). Courts may consult standard dictionaries in determining the fair, objective meaning of undefined

statutory terms. *Clinton v. State*, 354 S.W.3d 795, 800 (Tex. Crim. App. 2011).

■ In contrast to our limitation to the text of a statute with plain language, we consider extra-textual factors to determine the meaning of language that is not plain. When a statute is ambiguous or its plain language would lead to absurd results not possibly intended by the Legislature, we may consult extra-textual factors, including legislative history. *See Boykin*, 818 S.W.2d at 785-86; *see also* Tex. Gov't Code § 311.023. Under those circumstances, we consider extra-textual factors to discern the Legislature's intent in enacting the statute. *Bays v. State*, 396 S.W.3d 580, 585 (Tex. Crim. App. 2013). Ambiguity exists when a statute may be understood by reasonably well-informed persons to have two or more different meanings. *Id.*; *see also Baird v. State*, 398 S.W.3d 220, 229 (Tex. Crim. App. 2013) (statute is ambiguous when the language it employs is "reasonably susceptible to more than one understanding").

■ Here, appellant's challenge is limited to the sufficiency of the evidence to establish the deadly weapon finding, and thus we limit our review to that issue. Furthermore, because a legal-sufficiency challenge need not be preserved by objection in a trial court, appellant was permitted to present that complaint in the first instance to the court of appeals. *Moore v. State*, 371 S.W.3d 221, 225, 227 (Tex. Crim. App. 2012). We, therefore, turn to an analysis of the meaning of the deadly weapon statute.

**B. The Deadly Weapon Statute is Ambiguous**

After examining the statutory language, we determine that the statute is ambiguous because a reasonable person could read its terms as applying either to only humans or to all organisms that are capable of cessation of life.

**1. The Statute's Language**

■ The deadly weapon statute at issue here is set forth in Article 42.12, § 3g(a)(2), which provides for a stricter penalty for an offender who has "used or exhibited [a deadly weapon] during the commission of a felony offense or during immediate flight therefrom." Tex. Code Crim. Proc. art. 42.12, § 3g(a)(2) (West 2013). A "deadly weapon" includes "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code § 1.07(a)(17)(B). The term "serious bodily injury" is defined as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46). "Bodily injury" means "physical pain, illness, or impairment of physical condition." *Id.* § 1.07(a)(8). The statutory language is exceedingly broad in that a "deadly weapon" may be "anything," and there is no limitation as to what type of thing may be considered a deadly weapon. *See id.* § 1.07(a)(17)(B); *Plummer v. State*, 410 S.W.3d 855, 858 (Tex. Crim. App. 2013) (noting that "[deadly weapon] includes any instrument that threatens or causes serious bodily injury, even when the instrument is not inherently or intentionally deadly"). A deadly weapon finding can be made even in the absence of actual harm or threat. *Plummer*, 410 S.W.3d at 859 (citing *Patterson v. State*, 769 S.W.2d 938, 941 (Tex. Crim. App. 1989) (allowing a deadly weapon finding where the exhibition of the weapon reasonably could have

"protected and facilitated appellant's care, custody, and management of the contraband")).[2]

Although our review in this case examines the deadly weapon statute, the question before us is exceedingly narrow. The issue is whether the intended target of the exhibition or use of a deadly weapon may be a nonhuman. Nothing in this opinion modifies this Court's existing precedent about what type of item may constitute a deadly weapon or the circumstances in which an object may be considered to be a deadly weapon. Regardless of the type of weapon and the circumstances of the use or exhibition, the question is whether a deadly weapon finding is permissible when the weapon was used or exhibited against a nonhuman. Although we may consider these other matters in evaluating the intended meaning of the statutory language, our holding in this case is limited to the exceedingly narrow determination that a deadly weapon finding is disallowed when the recipient or victim is nonhuman.

### 2. The Deadly Weapon Statute's Language is Ambiguous

A review of the statute's language, as it generally applies to offenses in the penal code and as it specifically applies in the context of the animal-cruelty statute, reveals that it is ambiguous with respect to whether it was intended to apply to only humans or to all living organisms. Reasonable people could reach opposite conclusions about the meaning of the statutory language as it pertains to this question. Furthermore, this Court's precedent supports our conclusion that the deadly weapon statute is ambiguous.

### a. The Deadly Weapon Statute For General Offenses in the Penal Code

There are two reasonable alternative meanings of the statutory language as that deadly weapon statute may apply to all offenses in the penal code. On the one hand, the State is correct that a reasonable person could examine the deadly weapon statute and determine that it broadly refers to "serious bodily injury" or "death," without mentioning the identity or type of victim against whom the use or exhibition of the deadly weapon must have been directed. *See* TEX. PENAL CODE § 1.07(a)(46). The Texas Penal Code does not define the word "death," although it appears to consider human death by specifying that death "includes, for an individual who is an unborn child, the failure to be born alive." *Id.* § 1.07(a)(49). "Individual" is, in turn, defined as "a human being who is alive, including an unborn child at every stage of gestation from fertilization until birth." *Id.* § 1.07(a)(26). Similar to the penal code's apparent references to death in the context of humans, the Health and Safety Code more specifically uses the term for human death. The Legislature may have considered the definition of "death" as that term is used in the Health and Safety Code, which states, "A person is dead when, according to ordinary standards of medical practice, there is irreversible cessation of the person's spontaneous respiratory and circulatory functions." TEX. HEALTH & SAFETY CODE § 671.001(a). Black's Law Dictionary, however, more generally defines "death" as the "ending of life; the cessation of all vital functions and signs." *Death*, BLACK'S LAW DICTIONARY 484 (10th ed. 2014).

---

**2.** In this opinion, we sometimes use the term "victim" as shorthand for the person or animal against whom the deadly weapon was used or exhibited. However, nothing in this opinion is intended to suggest that there must be actual injury or death to a being for a deadly weapon finding to be made.

Because the penal code fails to define "death" and a common understanding of that word may expansively include organisms with vital functions that cease to function, a reasonable person could determine that the deadly weapon statute's inclusion of the word "death" is broad enough to include nonhuman forms of life, such as animals and plants. Using a commonplace understanding of the meaning of the word "death," reasonable people could consider this statute as broadly applying to the permanent cessation of all vital functions of humans, animals, and even plants. A reasonable person could assert that, due to the absence of any express limitation to the terms in the statute, the statute should be broadly construed to permit a finding when any living organism is the victim.

On the other hand, a reasonable person could examine the deadly weapon statute and determine that the definitions of the terms it uses limits its applicability to human victims only. Taken as a whole, the terms "serious bodily injury" or "death" could reasonably refer to humans only because the statute's definitions for those terms use phrases more commonly associated with humans than with nonhumans. As noted above, the word "death" in the Penal Code and Health and Safety Code appears to refer to humans. Furthermore, the term "serious bodily injury" appears to refer to humans. For example, it would be unusual to refer to a nonhuman as having "serious bodily injury" that is defined as "serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *See* TEX. PENAL CODE § 1.07(a)(46). Similarly, it would be unusual to apply the definition for "bodily injury" that means "physical pain, illness, or impairment of physical condition" to a nonhuman. *Id.* § 1.07(a)(8).

■ In examining whether statutory language is plain, we must consider the terms in the context in which they appear. The deadly weapon statute appears in Chapter 42 of the Code of Criminal Procedure, entitled "Judgment and Sentence," in a specific section entitled "Community Supervision." TEX. CODE CRIM. PROC. art. 42.12. Section three in that Article permits a judge to suspend imposition of sentence and place the defendant on community supervision. *Id.* art. 42.12, § 3. Section 3g, however, excludes from section three the offenses for which a judge may not order community supervision, including (1) murder; (2) capital murder; (3) indecency with a child; (4) aggravated kidnapping; (5) aggravated sexual assault; (6) aggravated robbery; (7) use of a child in the commission of certain offenses; (8) certain violations of drug-free zones; (9) sexual assault; (10) first-degree felony injury to a child; (11) sexual performance by a child; (12) first-degree felony solicitation; (13) compelling prostitution; (14) trafficking of persons; and (15) certain burglaries. *Id.* art. 42.12, § 3g(a)(1). The deadly weapon provision in Subsection 3g(a)(2) that is the subject of this appeal immediately follows this list. The placement of the deadly weapon provision after the listed offenses for which the Legislature sought more stringent punishment due to their violence or danger to human victims would seem to suggest that the Legislature was focused on the protection of human victims. However, that placement of this subsection, following the list of human-victim offenses, is not definitive because one might reasonably argue that the Legislature placed this broader language for deadly weapons into the statutory prohibition on community supervision in order to ensure that all types of offenses, including those involving human and nonhuman victims, could result in a deadly weapon finding.

We conclude that reasonable people may examine the terms of the deadly weapon

statute as it applies generally to offenses and reach opposite conclusions as to whether it would apply to situations involving nonhuman victims. But the State also argues that the statute is not ambiguous in the specific context of the animal-cruelty statute, and thus we turn next to that suggestion.

### b. The Deadly Weapon Statute in the Context of Animal-Cruelty Statute

Despite the ambiguity in the deadly weapon statute as it generally applies to offenses in the penal code, the State argues that the particular statutory language in the animal-cruelty statute under which appellant was convicted in this case plainly permits a deadly weapon finding. Section 42.092 of the Penal Code, entitled "Cruelty to Nonlivestock Animals," states, "A person commits an offense if the person intentionally, knowingly or recklessly: (1) tortures an animal or in a cruel manner kills or causes serious bodily injury to an animal." TEX. PENAL CODE § 42.092(b)(1).

The State contends that the animal-cruelty statute's use of the phrase "kills or causes serious bodily injury to an animal" necessarily includes the use of a deadly weapon because (1) the phrase "serious bodily injury" appears in both the deadly weapon statute and animal-cruelty statute and (2) it is impossible to inflict serious bodily injury or death without the use of a deadly weapon. A close comparison of the deadly weapon statute and animal-cruelty statute reveals that, although they each incorporate the same phrase "serious bodily injury," they use different terms for the

loss of life, they criminalize the loss of life under different circumstances, and the term has varied meanings in the two statutes. Thus, we are unpersuaded that the plain language of the animal-cruelty statute reveals the Legislature's intent to permit a deadly weapon finding.

It is true that the animal-cruelty statute and the deadly weapon statute each use the same phrase "serious bodily injury," but it is also true that the two statutes use entirely different terms for the cessation of life. The animal-cruelty statute uses the term "kill" and the deadly weapon statute uses the word "death." *See* TEX. PENAL CODE §§ 1.07(a)(46), 42.092(b); TEX. CODE CRIM. PROC. art. 42.12, § 3g(a)(2). This choice of vocabulary suggests that the interests at stake are quite different in that the penal code, within which the animal cruelty statute appears, expressly permits the lawful killing of nonlivestock animals under certain circumstances. The animal-cruelty statute states, "It is an exception to the application of this section that the conduct engaged in by the actor is a generally accepted and otherwise lawful: (1) form of conduct occurring solely for the purpose of or in support of: (A) fishing, hunting, or trapping; or (B) wildlife management, wildlife or depredation control, or shooting preserve practices ...; or (2) animal husbandry or agriculture practice involving livestock animals." TEX. PENAL CODE § 42.092(f). Recognizing that cessation of the life of certain animals is lawful under certain circumstances, the animal cruelty statute used the word "kill." *See id.*[3] In contrast, the deadly weapon statute incorporates the definition of deadly weap-

---

**3.** *See also id.* § 42.092(d), (e) (providing defenses to prosecution for animal cruelty for killing an animal to prevent bodily injury to a person, protecting livestock animals, or crops, bona fide experimentation for scientific research, or when the killing occurred within the scope of a person's employment as a pub-

lic servant or in furtherance of activities associated with the generation, distribution, or transmission of electricity or natural gas); *see also Chase v. State*, 448 S.W.3d 6, 28 (Tex. Crim. App. 2014) (discussing TEX. HEALTH & SAFETY CODE § 822.013 as a defense to animal cruelty).

on that uses the broader word "death." *See* TEX. PENAL CODE § 1.07(a)(17)(B). A killing involves a death, but a death does not necessarily involve a killing. Unlike the authorized killing of an animal, the penal code provides no exceptions to offenses that cause death or serious bodily injury to a person. *See id.* § 9.02 ("It is a defense to prosecution that the conduct in question is justified under this chapter."); *see also id.* § 2.02.

Although both relevant statutes use the identical phrase "serious bodily injury," the statutes are materially different in their descriptions about the cessation of life, with the animal-cruelty statute permitting certain killings, and the deadly weapon statute more broadly using the word "death." Given these differences in the two statutes, we do not consider the fact that the Legislature used part of the phrase in the deadly weapon statute, "serious bodily injury," but not the entire phrase "serious bodily injury or death," to render the statutory language plain so as to reveal the Legislature's intent to permit a deadly weapon finding for violations of the animal-cruelty statute.

We additionally note that the two statutes use the same phrase "serious bodily injury," but that phrase has different proof requirements and meanings in each context. Unlike the evidence necessary for a deadly weapon finding (i.e., the use or exhibition of an object capable of causing death or serious bodily injury), offenses under subsections (b)(1) or (b)(2) of the animal-cruelty statute require proof of more than death or serious bodily injury to an animal. Subsection (b)(1) requires that the killing or infliction of serious bodily injury be "in a cruel manner," where cruel manner is defined to include "a manner

that causes or permits unjustified or unwarranted pain or suffering." *Id.* § 42.092(a)(3), (b)(1). Subsection (b)(2) requires that the killing or serious bodily injury be "without the owner's effective consent." *Id.* § 42.092(b)(2).[4] Thus, while it might be adequate to show death or serious bodily for a deadly weapon finding for humans, additional facts must be shown before an individual may be found guilty of animal cruelty in that the serious bodily injury or death must have occurred under circumstances showing a cruel manner or absence of an owner's effective consent. The inclusion of these additional requirements further reduces the similarity between the animal-cruelty statute's use and the deadly weapon definition's use of "serious bodily injury." Accordingly, the additional statutory elements of "in a cruel manner" or "without the owner's effective consent" weigh against the inference that the use of the phrase "serious bodily injury to an animal" signals a clear legislative intent to permit deadly weapon findings for animal-cruelty offenses.

The State also suggests that the language in the animal-cruelty statute that includes the phrase "to an animal" in the context of "kills or causes serious bodily injury to an animal" necessarily means that the Legislature intended to permit a deadly weapon finding. *See id.* § 42.092(b)(1), (2). The State argues that it is impossible to kill or cause serious bodily injury without the use of a deadly weapon. Although the State's reading of the statute may be a reasonable interpretation of the language, we conclude that it is equally reasonable that the Legislature did not intend for this language to permit a deadly weapon finding, and thus that the meaning of the statute is ambiguous. The phrase "to

---

4. Section 42.092(b)(2) makes it a state-jail felony offense to intentionally, knowingly, or recklessly, without the owner's effective consent, kill, administer poison to, or cause serious bodily injury to an animal. TEX. PENAL CODE § 42.092(b)(2).

an animal" could connote the meaning that the State suggests, but it could equally have been inserted there by the Legislature to limit the applicability of the statute to animals that are specifically identified in the definition. The statute defines "animal" as "a domesticated living creature, including any stray or feral cat or dog, and a wild living creature previously captured. The term does not include an uncaptured wild living creature or a livestock animal." *Id.* § 42.092(a)(2). The word "animal" in that statute is distinguished from "livestock animal" that is covered in a different section. Section 42.09, entitled "Cruelty to Livestock Animals," defines "livestock animal" as "(A) cattle, sheep, swine, goats, ratites, or poultry commonly raised for human consumption; (B) a horse, pony, mule, donkey, or hinny; (C) native or nonnative hoofstock raised under agriculture practices; or (D) native or nonnative fowl commonly raised under agricultural practices." *Id.* § 42.09(b)(5). Thus, the reference to killing or causing serious bodily injury "to an animal" could reasonably suggest that the Legislature intended to permit a deadly weapon finding for the death of an animal, but, alternatively, it could also mean that the statute was merely defining the types of creatures to which the statute was intended to apply. For this reason, the language in the animal-cruelty statute is ambiguous rather than plain with respect to whether it would specifically permit a deadly weapon finding.

We also note that there is nothing in the deadly weapon statute that suggests that the Legislature intended to permit the finding on an assessment of a statute-by-statute analysis as compared to permitting it for all offenses anytime the facts established that a deadly weapon was used or exhibited against a person with the intent to facilitate an offense. *See Patterson*, 769 S.W.2d at 940 (noting that "all felonies are theoretically susceptible to an affirmative finding of use or exhibition of a deadly weapon"). We, therefore, are unpersuaded that the particular language in the animal-cruelty statute would determine whether a deadly weapon finding could be made. Furthermore, because the animal-cruelty statute defines an "animal" as including a wild living creature previously captured, the State could not limit the statute to victims that are dogs, but instead, if we permitted a deadly weapon finding as to the animal-cruelty statute, the possible victims include a turtle, rat, rabbit, deer, or even a fly or mosquito. *See* Tex. Penal Code § 42.092(a)(2).

The State also contends that the animal-cruelty statute's use of the phrase "kills or causes serious bodily injury to an animal" necessarily includes the use of a deadly weapon because it is impossible to inflict serious bodily injury or death without the use of a deadly weapon. The State relies on *Crumpton v. State*, in which this Court held that a deadly weapon finding was properly made when a jury found a defendant guilty of criminally negligent homicide "as included in the indictment" and the indictment had alleged a deadly weapon. 301 S.W.3d 663, 664 (Tex. Crim. App. 2009). Although it is true that an affirmative finding of a deadly weapon may be made based on the jury's finding of guilt under circumstances in which an indictment pleads a deadly weapon allegation and the jury finds a defendant guilty as charged in the indictment, that does not answer the instant question whether an affirmative finding of a deadly weapon may be made when the victim is a nonhuman.

Given that reasonable people could disagree about the meaning of the statutory language, the deadly weapon statute is ambiguous as to whether it applies only to humans. Nothing in the plain language of the statute limits the victim of the use or exhibition of the deadly weapon to humans

only, and for all of the reasons explained above, reasonable minds may disagree about whether the Legislature intended for this statute to be limited to only humans.

### c. Precedent Suggests Deadly Weapon Statute's Language is Ambiguous

This Court has previously discussed the broad nature of the language in this statute when we held that its language was ambiguous in another respect. This Court held in *Plummer v. State* that the statutory language was ambiguous as to whether the exhibition of a deadly weapon must help facilitate the commission of the felony. *See Plummer*, 410 S.W.3d at 861. This Court's rationale in *Plummer* supports our conclusion that the language in this case is also ambiguous.

In *Plummer*, this Court held that a deadly weapon finding for a felony offense requires some facilitating connection between the weapon and the felony. *Id.* at 864-65. We deleted the affirmative finding of a deadly weapon that had been imposed against Plummer, explaining that his possession of a handgun did not play any role in enabling, continuing, or enhancing the offense of possession of body armor under the circumstances in which Plummer was working as a security guard. *Id.* at 865. Similar to our determination that the language in the deadly weapon statute was ambiguous in *Plummer*, here we also conclude that the language is ambiguous as to whether the object of the use or exhibition of the deadly weapon may be a nonhuman. The types of concerns this Court had in *Plummer* with the broader statutory language are similar to those here, but this time with respect to the type of victim that may be considered. In light of the broad language in the deadly weapon statute, we again conclude, as we did in *Plummer*, that the statute is ambiguous.

Although we note that our precedent supports our view that this statute is ambiguous, we disagree with appellant's suggestion that this Court's precedent has more definitively held that a deadly weapon finding is limited to human victims only. We agree with the court of appeals's determination that this Court's precedent does not definitively address the issue before us in the instant case. Appellant cited *Cates v. State*, but there this Court held that "to sustain a deadly weapon finding, there must be evidence that others were actually endangered, not merely a hypothetical potential for danger if others had been present." 102 S.W.3d 735, 738 (Tex. Crim. App. 2003). Appellant also cited *Brister v. State*, but there this Court held that, "in order to sustain a deadly weapon finding, the evidence must demonstrate that: (1) the object meets the definition of a deadly weapon; (2) the deadly weapon was used or exhibited during the transaction on which the felony conviction was based; and (3) other people were put in actual danger." *Brister v. State*, 449 S.W.3d 490, 494 (Tex. Crim. App. 2014). We agree with the court of appeals that, although we discussed the deadly weapon finding as it would pertain to humans in those cases, this Court was not called upon in those cases to address whether the finding would be appropriate as to nonhumans. Thus, the question in this case presents a matter of first impression in this Court.

In sum, although we believe that it is more reasonable to view the statutory definitions for "serious bodily injury" and "death" as referring to humans only, we conclude that the language is not so plain that people could not reasonably disagree about whether the terms "serious bodily injury" and "death" could also apply to animals or even plants. At this juncture, we only decide that it is necessary to consider extra-textual sources because the

statutory language is not so clear that we may fairly characterize its meaning as plain. Having determined that the language is ambiguous, we need not address whether the plain language would lead to absurd results before considering extra-textual factors. *See Boykin*, 818 S.W.2d at 785 (holding that a court may consider extra-textual factors if and only if the statutory language is ambiguous or would lead to absurd results). We next consider extra-textual sources to determine whether the Legislature intended for the deadly weapon statute to apply to nonhuman victims.

## C. Extra-Textual Analysis

 Having determined that the plain language is ambiguous, we may consider extra-textual factors, including (1) the legislative history, (2) the objective of the statute, and (3) the consequences of a particular construction, to determine the Legislature's intent in enacting the statute. *See Chase v. State*, 448 S.W.3d 6, 11 (Tex. Crim. App. 2014); Tex. Gov't Code § 311.023(1), (3), (5).

### 1. Legislative History

 In *Plummer*, this Court described the legislative record discussing the specific terms in the deadly weapon statute as "skimpy." *Plummer*, 410 S.W.3d at 861 (citing *Polk v. State*, 693 S.W.2d 391, 393 n. 1 (Tex. Crim. App. 1985) (noting that the legislative history of SB 152, the bill that was to become Section 3 of article 42.12, "is incomplete" and that the intended meaning of specific terms within that legislation "is difficult to educe")). The general purpose of the statute, however, is well documented in that the Legislature apparently intended to provide more severe punishment against actors who risk serious bodily injury or death for crimes against people. *See id.* One witness testifying before the 1977 Senate subcommittee on the deadly weapon provision stated that it was "intended to send a message to criminals to leave their firearms at home." *Id.* (citing *Tyra v. State*, 897 S.W.2d 796, 802-03 (Tex. Crim. App. 1995) (Maloney, J., concurring)). All of the discussion during the hearing centered on the commission of dangerous, violent felonies towards people, and the use of obvious weaponry, such as guns, grenades, and knives. The House sponsor for the bill explained,

> [I]t is a bill ... that deals with the situation of those people who have been involved with serious criminal acts. Those acts in almost every instance are those that deal with violent crime, the crime that deals with a weapon ... has intimidated and perhaps injured or killed or maimed some victim. It provides that there will be no probation in certain circumstances in a case dealing with a violent act.

*Id.* Senator Meier, the 1977 sponsor of Senate Bill 152 which contained the 3g deadly weapon provision, told the committee,

> [T]he purpose of the bill is to ... attempt to deter the commission of those crimes by insuring that other provisions of the criminal justice system, such as the calculation of good time credit, and such as the obtaining of probation, and such as the time a person is going to be eligible for parole, are denied the persons who commit those serious offenses in those limited circumstances. That is the purpose of the bill.

*Id.* (citing *Ex parte Jones*, 957 S.W.2d 849, 851 (Tex. Crim. App. 1997) (citing debate on H.B. 571, 65th Leg. (1977))). Although the legislative history is silent with respect to whether the Legislature specifically intended to more severely punish defendants who victimize animals or plants as well as humans, the substance of the arguments presented in favor of the legislation suggest that the focus of the statute

was to protect people from criminals who bring firearms and other weapons to commit their offenses. There is nothing in the legislative history to suggest that the statute was enacted to enhance the penalties for deadly weapons used or exhibited against nonhumans. Moreover, as explained above, because a primary purpose of the deadly weapon statute is to deter using or exhibiting deadly weapons in a criminal act because their presence increases the likelihood of violence and the severity of injuries by escalating the dangers involved, that rationale fails when the crimes are directed against nonhumans. For example, a mugger who produces a knife or a firearm to compel his victim's wallet creates a far more dangerous situation than if unarmed because the victim can perceive the weapon and understand the increased threat. With respect to an animal, it is extraordinarily unlikely that an animal would comprehend the significance of a deadly weapon in its interaction with a person. The legislative history, therefore, weighs in favor of permitting a deadly weapon finding for humans only.

## 2. The Objective of the Statute

▬▬ Considering the objective of the statute, we determine that it is unlikely that the Legislature intended to broadly include nonhumans as the entity against whom the deadly weapon was used or exhibited. A deadly weapon finding significantly affects the gravity of the punishment, carrying with it serious legal consequences that may affect probation eligibility, parole, and the punishment range. *See Plummer*, 410 S.W.3d at 858. When that finding is made, among other possible consequences, the offender is not eligible for judge-ordered community supervision; he is ineligible for parole until he has served either at least one-half of his prison sentence or a minimum term of confinement; or he must be sentenced in the punishment range for a third-degree felony for a state-jail felony offense. *See* TEX. CODE CRIM. PROC. art. 42.12 § 3g(a)(2) (community supervision); TEX. GOV'T CODE § 508.145(d)(1) (West 2013) ("An inmate serving a sentence for an offense ... for which the judgment contains an affirmative finding under Section 3g(a)(2) of that article ... is not eligible for release on parole until the inmate's actual calendar time served, without consideration of good conduct time, equals one-half of the sentence or 30 calendar years, whichever is less, but in no event is the inmate eligible for release on parole in less than two calendar years."); TEX. PENAL CODE § 12.35(c) (state-jail felony punished as third-degree felony).

We conclude that it is highly unlikely that the Legislature would have considered these enhanced penalties appropriate for causing the death of all types of animals and plants in the course of and to facilitate a felony offense. Perhaps as to some animals such as dogs, it might be reasonable to determine that the Legislature could decide that an enhanced punishment is appropriate. But the broad reading of the statute suggested by the State would not limit a deadly weapon finding to victims that are dogs. Rather, a broad reading of the statute would permit a deadly weapon finding for all nonhuman animal victims, such as flies, mosquitoes, rats, mice, etc. We conclude that it is highly unlikely that the Legislature would have considered these enhanced penalties appropriate for causing the death of a fly, for example, in the course of and to facilitate a felony offense. Consideration of the objectives of the statute weighs in favor of limiting it to human victims only.

## 3. Consequences of Construction

In considering the consequences of the construction of the statute, we conclude that it is more likely that the Legislature

intended to limit the deadly weapon statute to humans. Although we are unpersuaded by many of appellant's arguments, we agree with his ultimate contention that it would be absurd to read the broadly written statute as permitting a deadly weapon finding for nonhuman victims.

We briefly address and reject appellant's argument that permitting a deadly weapon finding under these circumstances would contravene the Legislature's intent to punish a first offender for animal cruelty as a state jail felony. We agree with the court of appeals that the Legislature's intent to punish a first offender for this offense as a state-jail felony could remain intact under some circumstances in which the serious bodily injury or death was to an animal by omission and a deadly weapon finding was not made under the facts of that case. *Prichard*, 2016 WL 1615641, at *2. The court of appeals cited to *Chambless v. State* to support its view that permitting a deadly weapon finding that would enhance the penalty to a third-degree felony would not affect cases of serious bodily injury or death by omission. 411 S.W.3d 498, 501 (Tex. Crim. App. 2013). In *Chambless*, this Court rejected the argument that, because a homicide by definition involves a death, a guilty verdict of criminally negligent homicide naturally implicates the use of a deadly weapon and makes every criminally negligent homicide punishable as a third-degree felony under Section 12.35(c) despite the Legislature's intent to punish that offense as a state-jail felony. *Id.* at 502-03 (citing Tex. Penal Code § 12.35(c)). We reject appellant's arguments for the same reason. Even assuming that a deadly weapon finding could be made for the serious bodily injury or death to a nonlivestock animal, that offense could be punishable as a state-jail felony if it was committed by omission and no deadly weapon finding was made, or it would be a third-degree felony if it was committed by the use a deadly weapon. Because there would remain the possibility of a state-jail felony punishment for a first offender who committed animal cruelty by omission under some circumstances, we are unpersuaded that permitting a deadly weapon finding and sentencing an offender in the third-degree punishment range would improperly circumvent the Legislature's intent to punish the offense as a state-jail felony. Having already rejected it in a similar context, this argument is not persuasive as a basis for reaching our decision.

In further considering the consequences of the construction suggested by the State, we are persuaded that the application of the deadly weapon statute to animal-victims in the animal-cruelty statute would lead to absurd results not intended by the Legislature through its broad phrasing in the statute. Appellant argues that allowing serious bodily injury to include nonhumans creates a slippery slope whereby causing death or serious bodily injury to any living creature could result in a deadly weapon finding. We agree. Permitting a deadly weapon finding in this case would necessarily mean that killing all animals could result in a deadly weapon finding. If this Court interpreted the broad phrasing in the deadly weapon statute to permit a deadly weapon finding for killing an animal covered in the animal-cruelty statute, that finding would significantly enhance the punishment that could be imposed against a defendant for causing serious bodily injury to or the death of, for example, frogs, lizards, turtles, and rats. The finding would not be limited to, for example, cats, dogs, or horses, or other animals that many people may view as pets or loved ones. Under the State's theory, a defendant may not be considered for community supervision or may have to serve half of his prison sentence before he could be

considered for parole because he broke the leg of a frog while committing felony criminal mischief, such as shooting at and damaging an abandoned building with a firearm, even though there were no other humans anywhere close. Under the State's theory, if the deadly weapon statute was applied to nonhuman victims in this broad manner, a felony DWI could include an affirmative finding of a deadly weapon if the defendant killed a lizard or squirrel while driving a vehicle intoxicated because the vehicle was the deadly weapon that was used to facilitate the defendant's commission of the offense. Similarly, running over a turtle or plant while fleeing from an officer in a car could result in an affirmative finding. And even causing the death of a plant in a criminal mischief case in which the damage was the destruction of a tree with a firearm, ax, or poison could result in an affirmative finding. If we held that the Legislature intended for the statutory language to broadly apply to animals, as the State proposes, then this would permit a deadly weapon finding as to all animals, and not just to those that some of us may prefer, such as cats, dogs, and horses. There is nothing in the statutory language or legislative history that would limit the deadly weapon finding to certain animals or even to the animal-cruelty statute alone. We, therefore, agree with appellant that the Legislature's broad phrasing of the deadly weapon statute that would permit a deadly weapon finding for all animals and all criminal offenses leads to irrational results that do not appear to have been intended based on our consideration of the extra-textual factors.

Of course, we do not hold that it would be irrational or absurd for the Legislature to write a statute that expressly permits deadly weapon findings to elevate the punishment for exhibiting or using a deadly weapon that may threaten or cause serious bodily injury or death to certain animals or

plants or even to all animals or plants. Rather, we hold that, given the broadness of the particular statutory language in the deadly weapon statute, and given our consideration of the extra-textual factors, here the Legislature's apparent intent as to this statute was to permit a deadly weapon finding for those weapons that are used or exhibited against humans only.

■ In sum, the extra-textual factors weigh in favor of a conclusion that the Legislature's intent was to limit deadly weapon findings for human victims only. Taking the legislative history, the objective of the statute, and the consequences of the interpretations of the statute into consideration, we conclude that the Legislature intended to permit a deadly weapon finding only if the recipient of the use or exhibition of the deadly weapon was a human. The parties agree that the recipient of the use or exhibition of the deadly weapon in this case was a nonhuman. We, therefore, hold that the evidence was insufficient to sustain the deadly weapon finding in this case, and we order that the trial court's judgment delete the deadly weapon finding.

### III. Remand to the Trial Court

The jury found appellant guilty of animal cruelty and it made an affirmative finding of a deadly weapon. After that, on appeal, the court of appeals ordered the reformation of the trial court's judgment to reflect that appellant was convicted of the state-jail felony of cruelty to animals, and we agree with that modification. However, we further order the modification of the trial court's judgment to delete the affirmative finding of a deadly weapon from the judgment. In the absence of that finding, appellant's state-jail felony offense would no longer be punishable as a third-degree felony. TEX. PENAL CODE

§§ 42.092(c), 12.35(c)(1). We, therefore, must remand the case to the trial court for a new sentencing hearing for punishment as a state-jail felony.

## IV. Conclusion

We hold that the evidence is insufficient to support a deadly weapon finding under circumstances in which the sole recipient or being against whom a deadly weapon was used or exhibited was a nonhuman. We reverse the judgment of the court of appeals and remand the case to the trial court for a new punishment hearing.

Keller, P.J., filed a concurring opinion.

Yeary, J., filed a dissenting opinion in which Hervey, J., joined.

Keel, J., dissented.

Keller, P.J., filed a concurring opinion.

Is a flyswatter a deadly weapon? It meets the literal definition of a deadly weapon by design described in Penal Code § 1.07(a)(17)(A): it is "manifestly designed . . . for the purpose of inflicting death" (on flies).[1] Does this mean that a person who hits another person with a flyswatter commits an aggravated assault because he has engaged in an assault (offensive touching) with a deadly weapon?[2] Although this case involves a deadly weapon by usage (shovel) rather than one by design, both the design and usage definitions of deadly weapon fail to explicitly limit the contemplated death or serious bodily injury to humans, and

that failure must be construed to mean the same thing. So, if the interpretation of the court of appeals is correct, then a flyswatter is a deadly weapon and hitting another person with a flyswatter is an aggravated assault, no matter what the circumstances. This is a patently absurd result that the legislature could not have possibly intended.

And the flyswatter example could be just the tip of the iceberg. One can think of other objects that are deadly weapons by design for animals, such as fishing rods and mouse traps. Under the court of appeals's construction, a shovel could be a deadly weapon if it is used to kill a bug or a rodent. Under that theory, killing a spider with a shovel during a trespass converts the trespass from a Class B to a Class A misdemeanor.[3]

The absurdity of applying the deadly-weapon definitions to living creatures other than humans allows the Court to examine extratextual factors such as the object to be attained and the consequences of a particular construction.[4] A holding that the definitions apply only to human beings is the only principled construction that avoids absurd results.

The dissent contends, however, that, even if the deadly-weapon-by-usage definition requires that the object be used in a manner that is *capable* of causing death or serious bodily injury to a human, the shov-

1. *See* TEX. PENAL CODE § 1.07(a)(17)(A) ("a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury").

2. *See id.* §§ 22.01(a)(3) ("intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative"), 22.02(a)(2) ("A person commits an offense if the person commits assault as defined in § 22.01 and the person. . . . uses or exhibits a deadly weapon during the commission of the assault.").

3. *See id.* § 30.05(d)(3)(B) ("the person carries a deadly weapon during the commission of the offense.").

4. *Ex parte White*, 506 S.W.3d 39, 42 (Tex. Crim. App. 2016).

el in the present case would qualify.[5] The dissent claims that this is so because the shovel struck the dog with enough force that, had the dog been a human, the shovel could have caused death or serious bodily injury. This argument could apply equally to the killing of a spider, as long as the shovel was swung with enough force that, had the spider been a human, the shovel could have caused death or serious bodily injury. Why limit the principle to an animal at all? If the shovel had been swung with the requisite force at a sapling, or even at the ground, the underlying logic would seem to be the same. If all that matters is that the force that had been exerted could have caused death or serious bodily injury to a human, if the human had been the object of that force, then striking the shovel against the ground should be sufficient. We rejected that sort of argument in *Brister v. State*, where we held that driving while intoxicated and crossing the center stripe was not sufficient to make the defendant's car a deadly weapon when there was no traffic on the road.[6] But even if *Brister* were wrong, on the theory that one should expect traffic on a road at any given time, that sort of expectation would not exist here.

I concur in the court's judgment.

Yeary, J., filed a dissenting opinion in which Hervey, J., joined.

Suppose that we were called upon today to construe, not Section 1.07(a)(17)(B) of the Penal Code, but Section 1.07(a)(17)(A): " 'Deadly weapon' means . . . a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury[.]" Tex. Penal Code § 1.07(a)(17)(A). Suppose that, in-

stead of hitting his dog on the head with a shovel and drowning her in a swimming pool, Appellant had first shot his dog with a firearm to disable her, and then used a garrote to strangle her to death. In that case, he would have committed the same state jail felony he was convicted of in this case, namely, Cruelty to a Nonlivestock Animal under Section 42.092(b)(1) of the Penal Code, in that he would have, "in a cruel manner[,] kill[ed] or cause[d] serious bodily injury" to his domesticated dog. Tex. Penal Code § 42.092(b)(1) & (c). His punishment for this offense might then be boosted to that of a third degree felony "if it is shown on the trial of the offense that . . . a deadly weapon as defined by Section 1.07 was used . . . during the commission of the offense[.]" Tex. Penal Code § 12.35(c)(1).

Did my hypothetical Appellant, in fact, use a deadly weapon in contemplation of Section 12.35(c)(1)? Well, he used both a firearm, which by itself fits the definition of deadly weapon laid out in Section 1.07(a)(17)(A), and a garrote, which also meets that definition in the sense that it is "manifestly designed" to kill by strangulation—indeed, it has no other purpose. Moreover, the firearm and garrote both clearly "facilitated" Appellant's commission of the offense. *Plummer v. State*, 410 S.W.3d 855, 865 (Tex. Crim. App. 2013). It seems plain enough to me that, under this scenario, Appellant would be susceptible to punishment as a third degree felon.

Would the Court say otherwise today, if it were called upon to decide the applicability of Section 1.07(a)(17)(A), instead of (as we do today) Section 1.07(a)(17)(B)? Would the Court say that the use of a firearm or garrote does not support a

---

5. *See id.* § 1.07(a)(17)(B) ("anything that in the manner of its use or intended use is capable of causing death or serious bodily injury").

6. 449 S.W.3d 490, 494-95 (Tex. Crim. App. 2014).

deadly weapon finding because any victim of an offense under Section 42.092 of the Penal Code is a domesticated animal, not a person? Does a firearm constitute a firearm only when it is used to kill people? Is a garrote any less "manifestly designed" to cause death or serious bodily injury when it is used to strangle a dog rather than a human? Under the plain and unambiguous language of Section 1.07(a)(17)(A), Appellant would have used a deadly weapon during the commission of the offense in contemplation of Section 12.35(c)(1), notwithstanding that his victim was a dog. So, in what way, exactly, is Section 1.07(a)(17)(B) any less plain?

## Ambiguity?

Section 1.07(a)(17)(B) alternatively defines a deadly weapon to be "anything that in the manner of its use . . . is capable of causing death or serious bodily injury." TEX. PENAL CODE § 1.07(a)(17)(B). The Court says this language is ambiguous; that it is unclear whether the Legislature intended that, to be a deadly weapon, the thing must be capable of causing death or serious bodily injury to a human. Reading between the lines of the Court's opinion, it strikes me that what the Court really finds

disquieting is not any genuine uncertainty about the meaning of the statute, but rather the obvious breadth of the statutory language. The Court concedes that there is nothing intrinsic in the language of Subsection (B) that necessarily limits its application to implements that are capable of killing or seriously injuring human beings. Majority opinion at 321–22.[1] The Legislature expressly contemplated that other living creatures are susceptible to death or serious bodily injury, as the Cruelty to Nonlivestock Animals statute itself illustrates, making it an offense to kill or cause serious bodily injury to a domesticated animal. TEX. PENAL CODE § 42.092(b)(1). But neither the broad scope of the statutory language nor judicial disquietude about the potential sweep of that language renders a plain statute ambiguous.

Whether a statute is plain or ambiguous "is sometimes a function of the question that is brought to bear. A given statutory provision will sometimes clearly answer one question but remain hopelessly insoluble with respect to another." *McClintock v. State*, No. PD-1641-15, —— S.W.3d ——, ——, 2017 WL 1076289, at *3 n.5 (Tex. Crim. App. Mar. 22, 2017).[2] Certainly one question we confront today regarding Sec-

---

1. On direct appeal, Appellant argued that our case law has limited the deadly weapon definition in Section 1.07(a)(17)(B) to implements capable by the manner of their use to causing death or serious bodily injury to "individuals." *See* TEX. PENAL CODE § 1.07(a)(26) (defining "individual" to mean "a human being who is alive"). But Section 1.07(a)(17)(B) does not limit its definition to things that, by the manner of their use, are capable of causing death or serious bodily injury to "individuals," as so defined. The court of appeals rightly rejected this particular argument. *Prichard v. State*, No. 05-14-01214-CR, 2016 WL 1615641, at *2-3 (Tex. App.—Dallas 2016). Indeed, the Legislature might easily have enacted the narrower meaning of Section 1.07(a)(17)(B) that the Court imposes upon it today had it expressly provided that a

thing is a deadly weapon if, in the manner of its use, it is capable of causing death or serious bodily injury *to an individual*. But the Legislature did not, and there is no particular reason to believe it meant to.

2. The Court observes that we have found Article 42.12, Section 3g(a), of the Texas Code of Criminal Procedure to be ambiguous in the past, and contends that this somehow serves as "precedent" for the proposition that the definition of deadly weapon contained in Section 1.07(a)(17)(B) of the Penal Code is also ambiguous. *See* Majority Opinion at 326 (discussing *Plummer*). But the question we brought to bear on Article 42.12, Section 3g(a), in *Plummer*, was not remotely the same as the one we must ask about Section 1.07(a)(17)(B) in this case.

tion 1.07(a)(17)(B) is this: To what must a thing be capable, in the manner of its use, of causing death or serious bodily injury before that thing may be designated a "deadly weapon"? On its face, the statute is quite broad in this respect. Nothing in the language of the statute places any restriction, explicit or implicit, on what must be found to have been exposed to death or serious bodily injury by the manner in which the defendant used the alleged implement. Thus, the answer seems evident enough: a deadly weapon, as so defined, may be found to be a deadly weapon regardless of the species of living creature it is used against—period.

Is it open to some reasonable alternative interpretation? Surely not simply on account of its breadth. Otherwise, the Legislature would be encumbered in its ability to enact broad provisions even when that is its manifest intention—or at least its broad intentions would always be subject to frustration in the form of meddlesome judicial narrowing. Still, the Court offers no arguments of consequence *beyond* the apparent breadth of the statute that justify declaring it to be subject to more than one reasonable construction.

Many, if not all, of the reasons that the Court provides to support its conclusion that Section 1.07(a)(17)(B)'s definition of deadly weapon may reasonably be construed to require a human victim fail to focus on the statutory language itself and are, frankly, non sequiturs. For example, the Court asserts that it would be "unusual" for the Legislature "to refer to a nonhuman as having 'serious bodily injury.'"

as that term is defined in Section 1.07 of the Penal Code, and that it would be equally "unusual" for the Legislature to apply Section 1.07's definition of "bodily injury" to a nonhuman. Majority Opinion at 322 (citing TEX. PENAL CODE § 1.07(a)(46)). But, as I have already observed, the Cruelty to Nonlivestock Animals statute itself criminalizes the act of causing "serious bodily injury" to a domesticated animal,[3] and presumably the Legislature intended the courts to consult Penal Code Section 1.07(a)(46)'s definition in construing that provision.

Next, the Court observes that the statutory provision that authorizes a deadly weapon finding, Article 42.12, Section 3g(a)(2), of the Code of Criminal Procedure, follows on the heels of a laundry list of offenses against persons, contained in Section 3g(a)(1). Majority Opinion at 322–23. To the Court, this suggests that deadly weapon findings themselves may have been intended similarly to focus only on crimes against persons, not "nonhuman victims." *Id.* at 323. But the Court itself immediately acknowledges that Section 3g(a)(2) could just as plausibly be intended to be a kind of catch-all, "to ensure that all types of offenses, including those involving ... nonhuman victims, could result in a deadly weapon finding." *Id.* at 323. These considerations offer a disturbingly tenuous basis for departing from the plain, albeit broad, language of the statutory definition in the name of "ambiguity."[4]

Even the Court's asserted reasons why the ambiguity it perceives in the statute

---

3. It is an offense under Section 42.092(b)(1) if a person "in a cruel manner kills or causes serious bodily injury to an animal[.]" TEX. PENAL CODE § 42.092(b)(1).

4. Other arguments in favor of ambiguity are equally unpersuasive. Majority Opinion at 323–26. Some strike me as simply incomprehensible. For example, I simply do not under-

stand the significance of the Court's all-killings-involve-death-but-not-all-deaths-involve-killings distinction. *Id.* at 322–24. Nor is it at all evident to me why it matters that the Cruelty to a Nonlivestock Animal statute requires proof of killing "in a cruel manner" or "without the owner's effective consent." *Id.* at 324–25.

must be resolved in favor of requiring human victims lack substance. The Court begins with its analysis of the legislative history, claiming that it "suggests" a focus on protecting people rather than other living things. Majority Opinion at 327–28. But none of the sources it quotes backs this up. And, in fact, the Court admits that the legislative history is really "silent" with respect to this question. *Id.* at 327–28. Still, the Court insists, the Legislature must have contemplated deadly weapon ramifications only with respect to human victims because "it is extraordinarily unlikely that an animal would comprehend the significance of a deadly weapon in its interaction with a person." *Id.* at 328.[5] While many animals may lack the sentience to appreciate the peril of a deadly weapon, they are no less affected by its use, and recognizing the full scope of the plain statutory language better serves what we have already declared to be the legislative purpose, namely, to encourage criminals to leave their weapons at home. *Plummer*, 410 S.W.3d at 861.

### Absurd Results?

With regard to absurdity, the Court seems to take conflicting positions. It first agrees with Appellant's claim that "it would be absurd to read the broadly written statute as permitting a deadly weapon finding for nonhuman victims." Majority Opinion at 329. It then refuses to hold that it would be irrational or absurd "for the Legislature to write a statute that expressly permits deadly weapon findings to elevate the punishment for exhibiting or using a deadly weapon that may threaten or cause serious bodily injury or death to certain animals or plants or even to all animals or plants." Majority Opinion at

330–31. I am not sure what to make of this.

On the question of absurdity, I agree with the concurring opinion that it would be absurd to read our deadly weapon statute to require a conclusion that a flyswatter is a deadly weapon solely because it is "manifestly designed" to kill flies. Concurring Opinion at 331. Such an extreme application of the definition is not likely to have been contemplated by the Legislature. To my knowledge, the Texas Legislature has never enacted any provision making it a crime to cause death or serious bodily injury to a common housefly, and it is hard to imagine it ever meant to define deadly weapon in such a way as to impose consequences upon a criminal who would cause such a result. Likewise, I doubt that the Legislature intended that a bank robber who is unarmed should nevertheless be found to have used a deadly weapon if he stepped on a bug while taking the money from the bank teller—because the manner in which he used his shoe in perpetrating the offense was capable of causing death or serious bodily injury to an insect. TEX. PENAL CODE § 1.07(a)(17)(B).

One obvious limiting principle that would avoid such absurd applications would be to construe the statute, as the Court does today, to require that both the "manifestly designed" and "capable of causing" definitions of deadly weapon be limited to those things that are designed to cause, or are capable of causing, death or serious bodily injury to an "individual," *i.e.*, a human being. Even so, it seems to me that the majority focuses far too much on the limitation of the definition *it* finds most reasonable, and not enough on what the Legislature might have intended when it adopted the definition of a deadly weapon. We should not—as the Court seems to

---

**5.** It is unclear to me why this argument appears in that portion of the Court's opinion devoted to the legislative history. The Court

cites nothing from the legislative materials that remotely documents that any legislator ever actually articulated such a distinction.

do today—apply the limiting principle that *we* most prefer. We should instead seek to discern the limiting principle that most seems to effectuate the Legislature's objective in adopting the statute.

At least one other workable limiting principle that the Legislature may well have intended comes to mind. We could look, for example, to other statutes enacted by the Legislature to enlighten our consideration of the question of *what* Section 1.07(a)(17)(B)'s definition of deadly weapon applies to (*i.e.*, anything capable of causing death or serious bodily injury to ... *what*?). In this very case, the statute under which Appellant was prosecuted plainly proscribes killing or causing serious bodily injury to an "animal," meaning "a domesticated living creature, including any stray or feral cat or dog, and a wild living creature previously captured." TEX. PENAL CODE § 42.092(a)(2) & (b)(1). That the language of the Cruelty to a Nonlivestock Animal statute so closely tracks the "serious bodily injury" language found in Section 1.07(a)(17) could easily be taken as an indication that the Legislature intended that the consequences of a deadly weapon finding should extend to cases in which an implement is used in a manner that is capable of causing death or serious bodily injury to *some* other living entities besides human beings.[6]

In any event, even accepting the Court's "human-only" limiting principle and apply-ing it to the Section 1.07(a)(17) definition does not necessarily mean that a deadly weapon enhancement under Section 12.35(c) could not be made in this case. It seems to me that, even if the Court's construction of Section 1.07(a)(17)(B) is correct, the deadly weapon punishment enhancement was still appropriate on the facts presented. To be a deadly weapon, a thing must be, in the manner of its use, *capable* of causing death or serious bodily injury. TEX. PENAL CODE § 1.07(a)(17)(B). If the Court is right, the thing that the weapon must be *capable*, in the manner of its use, of causing death or serious bodily injury to is *a person*. Okay. Even accepting this premise, there is nothing about the statutory definition that suggests that the victim or intended victim must actually *be* a person; only that (assuming the Court's construction is correct) the thing used is *capable*, in the way in which it was used, of causing death or serious bodily injury *to a person*. Had Appellant hit *a person* over the head with a shovel and then drowned her in a swimming pool, that is a manner of use of those two things that would be capable of causing death or serious bodily injury. Thus, the manner in which Appellant used the shovel and water against his dog was *capable* of causing death or serious bodily injury to a person.[7] Surely we do not best effectuate even the Court's interpretation of the legislative intent by denying a Section 12.35(c) deadly

6. In making its case for the ambiguity of the legislative scheme, the Court argues that the parallel language in Section 1.07(a)(17)(B) and Section 42.092(b)(1) does not necessarily manifest a legislative intent that deadly weapon findings should extend to an animal victim of cruelty to a nonlivestock animal. *See* Majority Opinion at 323–24 ("Given these differences in the two statutes, we do not consider the fact that the Legislature used part of the phrase in the deadly weapon statute, 'serious bodily injury,' but not the entire phrase 'serious bodily injury or death,' to render the statutory language plain so as to reveal the Legislature's intent to permit a deadly weapon finding for violations of the animal-cruelty statute."). These arguments make no sense to me. *See* note 4, *ante.* In any event, even if the parallel statutory language does not *plainly* signify the Legislature's intent, it may yet serve to inform our judgment with respect to what extra-textual factors tell us about legislative intent.

7. If this argument is somehow inconsistent with the Court's opinion in *Brister v. State*, 449 S.W.3d 490 (Tex. Crim. App. 2014), Con-

weapon enhancement under these circumstances.

And finally, even if the Court is dead-set on mandating a "human-only" principle that limits the definition of deadly weapon to those implements that are capable of causing death or serious bodily injury to a *person*, I would hope the Court would at least concede that this does not mean that such a finding could never be made for any conceivable violation of Section 42.092(b)(1). Suppose, for instance, that while Appellant was beating his dog over the head with the shovel, his neighbor tried to intervene, and Appellant paused from beating his dog long enough to wave the shovel menacingly at his neighbor to warn him to stay away. Would the Court say that a deadly weapon enhancement was unavailable on those facts in a prosecution for beating his dog because the victim of that offense was not a person? The Court ultimately holds a deadly weapon finding is appropriate "only if the recipient of the use or exhibition of the deadly weapon was a human." Majority Opinion at 330. Would the Court hold that a deadly weapon finding could be made in a prosecution for assault against the neighbor, but not also for the Section 42.092(b)(1) offense? Clearly in this hypothetical Appellant would have used the shovel to facilitate the cruelty to a nonlivestock animal offense, and he would have threatened a person. *See Plummer*, 410 S.W.3d at 865 (use of a deadly weapon must facilitate the charged offense to justify a deadly weapon finding). Yet I confess I am unsure how the Court would apply today's holding to this hypothetical.

I respectfully dissent.

curring Opinion at 331–32, then the Court ought to overrule *Brister*.