William Preston HOPPER, Appellant

v.

The STATE of Texas, State

NO. 02–14–00467–CR

Court of Appeals of Texas,
Fort Worth.

DELIVERED: January 14, 2016

Mark B. Dewitt, Granbury, TX, for Appellant.

Robert T. Christian, District Attorney; Megan Chalifoux, Assistant District Attorney of Hood County, Granbury, TX, for State.

PANEL: DAUPHINOT, GABRIEL, and SUDDERTH, JJ.

**OPINION**

LEE GABRIEL, JUSTICE

A jury convicted appellant William Preston Hopper of continuous family violence with a deadly weapon, i.e., his hands, and the trial court sentenced him to life imprisonment as a habitual felony offender. *See* Tex. Penal Code Ann. § 12.42(d) (West Supp.2015), § 25.11 (West 2011). In two points, Hopper challenges the sufficiency of the evidence to support the deadly-weapon finding and argues that the State's jury argument was improper. Although we overrule both issues, we sua sponte modify the trial court's judgment to reflect that the trial court assessed Hopper's punishment and affirm it as modified. *See* Tex.R.App. P. 43.2(b).

**I. WAIVER**

In his first point, Hopper argues that the prosecutor twice improperly commented on his failure to testify during his closing argument to the jury. *See* Tex. Code Crim. Proc. Ann. art. 38.08 (West 2005). Hopper objected to the first argument, and the trial court sustained his objection. Hopper did not request an instruction to disregard the argument or move for a mistrial. "To preserve error in prosecutorial argument, a defendant must pursue to an adverse ruling his objection

to jury argument." *Archie v. State*, 221 S.W.3d 695, 699 (Tex.Crim.App.2007). Accordingly, Hopper has forfeited any error arising from the first argument. *See Young v. State*, 137 S.W.3d 65, 70 (Tex. Crim.App.2004). Hopper did not object to the second argument and, therefore, forfeited any error arising from this argument by the prosecutor. *See Threadgill v. State*, 146 S.W.3d 654, 667 (Tex.Crim.App. 2004); *Wead v. State*, 129 S.W.3d 126, 130 (Tex.Crim.App.2004). We overrule point one.

■ As part of his second point, Hopper argues in the alternative that his disqualification from the benefit of good-conduct time to reduce his sentence is unconstitutional as applied: "[I]n the alternative, ... the statute is unconstitutional in that the words 'or exhibited' in relation to a defendant's hands violated the equal protection and due process clauses of the Constitution." *See* Tex.Code Crim. Proc. Ann. art. 42.12, § 3g(a)(2) (West Supp.2015); Tex. Gov't Code Ann. § 508.145(d)(1) (West Supp.2015). Hopper raises this contention for the first time on appeal and fails to point us to any authority or to include any cogent argument supporting his alternative point. As such, he has failed to preserve any error for our review. *See Lucio v. State*, 351 S.W.3d 878, 896 (Tex.Crim. App.2011), *cert. denied*, —— U.S. ——, 132 S.Ct. 2712, 183 L.Ed.2d 71 (2012); *Ibenyenwa v. State*, 367 S.W.3d 420, 422–23 (Tex.App.–Fort Worth 2012, pet. ref'd) (op. on reh'g). We overrule this portion of point two.

## II. DEADLY–WEAPON FINDING

In the remaining portion of his second point, Hopper argues that the evidence was insufficient to support the jury's finding that he used his hands as a deadly weapon.

### A. STANDARD AND SCOPE OF REVIEW

■ In determining whether the evidence is sufficient to support a deadly-weapon finding, we must consider all of the evidence in the light most favorable to the finding and determine whether, based on that evidence and any reasonable inferences to be drawn from that evidence, a rational jury could have found beyond a reasonable doubt that the weapon alleged in the indictment was capable of causing death or serious bodily injury in the manner of its use or intended use. *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex.Crim. App.2010); *Lane v. State*, 151 S.W.3d 188, 191 (Tex.Crim.App.2004); *McCain v. State*, 22 S.W.3d 497, 503 (Tex.Crim.App. 2000).

### B. DEADLY–WEAPON EVIDENCE

Hopper was indicted with continuous violence against the family from October 1, 2013 to February 1, 2014, specifically against two of his girlfriends during this period: Sandra VanZant and Starla Green. *See* Tex. Penal Code Ann. § 25.11(a). The State alleged that Hopper committed assault—intentionally, knowingly, or recklessly caused bodily injury to VanZant and Green—by hitting them in the head with his hands and by impeding their breathing with his hands. *See id.* § 22.01(a)(1), (b)(2)(B) (West Supp.2015). Based on these allegations, the State sought a finding that Hopper "did use or exhibit a deadly weapon during the commission of the offense, to wit: said defendant's hands, that in the manner of its use or intended use was capable of causing death or serious bodily injury." *See id.* § 1.07(a)(17)(B) (West Supp.2015).

Both Green and VanZant testified at trial. Green dated Hopper and experienced his violent nature. During arguments, Hopper hit Green with his hands "on the side of the face or on the arm."

During one argument, Hopper sat on top of Green and "put his hand over [her] mouth . . . and nose." Green could not breathe and was afraid that she "wasn't going to live." The struggle continued for approximately ninety seconds, and Green testified that she was in danger of losing consciousness. During a later argument, Hopper dragged Green by her neck out of his truck where she fell to the ground. Hopper picked her up by the neck again and took her into the house. This caused Green to have a "linear bruise" across her neck, which was consistent with Hopper's arm being around her neck. Hopper also tried to "take [her] jaw off, rip it off" by pulling it down with his hands. Green had to use makeup to cover the bruises and cut lip that she received during this incident. This assault convinced Green she needed to leave Hopper and to report him to the police. All of Hopper's assaults on Green occurred during a two- to three-week period between the dates alleged in the indictment.

VanZant began dating Hopper after his relationship with Green ended. VanZant testified that Hopper grabbed her around her neck twice between the dates alleged in the indictment. The first assault occurred while she and Hopper were having an argument on the couch. Hopper hit her on the side of her head with his fist. Hopper continued hitting her and then sat on top of her, "grabbed" her by the throat, pinned her to the couch, and began "choking" her by putting both his hands around her throat with his thumbs to the front. He put "pressure" on her throat, and VanZant could not breathe for "a few seconds." She believed she was going to die. While Hopper was choking VanZant, his face was "wild" and "mad," and he called her a "stupid bitch." After Hopper released VanZant, he told her to "clean [herself] up." VanZant saw that her mouth

was bleeding and that her face was bruised and swollen.

The second assault happened on January 23, 2014, during a different argument at Hopper's house, which arose after Hopper suspected VanZant had talked to the police after the first assault. Hopper again hit VanZant in the head with his fist "a bunch" of times and then convinced VanZant to "go somewhere" in his truck. Hopper was "very upset" and began to tell VanZant that he would do to her "what they did to people that were snitches." When VanZant tried to roll down the window and call for help from passing motorists, Hopper hit her again. Hopper finally stopped the truck, removed VanZant from the truck, and began "punching" her. When VanZant could no longer stand, Hopper pulled her back to the truck by her hair and "shoved" her into his truck in the floorboard. Hopper sat on top of VanZant and began "choking" her by "squeezing [her] neck." VanZant's arms went numb, her peripheral vision failed, and she began to black out. VanZant believed she was going to die. She finally was able to press her thumb into Hopper's eye until he released her. VanZant experienced nausea, vomiting, and shortness of breath after the attack and also had bruising on her neck and hemorrhages in her eyes.

A forensic nurse examiner, Tiffanie Dusang, testified as an expert on strangulation. She reviewed VanZant's medical records and pictures of her injuries after the January 23, 2014 assault and concluded that they were consistent with VanZant being strangled. Similarly, Green's injuries—bruising on her neck and jaw—were consistent with Hopper using his hands on her neck and jaw as Green had testified. Dusang opined that a victim's estimates of how long such an episode occurred would not be reliable because it would be a "traumatic situation." Dusang testified that a

person could use his hands in a manner that is capable of causing death or serious bodily injury. Based on Green's and Van-Zant's testimonies, which Dusang heard, she concluded that Hopper had used his hands as a deadly weapon during some of the assaults. The jury concluded that the manner in which Hopper had used or intended to use his hands was capable of causing death or serious bodily injury.

## C. APPLICATION

 A deadly weapon is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code Ann. § 1.07(a)(17)(B). Body parts, such as hands, may be deadly weapons based on their manner of use or intended use and their capacity to produce death or serious bodily injury. See Turner v. State, 664 S.W.2d 86, 90 (Tex.Crim.App. [Panel Op.] 1983) ("[A] fist or hands are not 'deadly weapons' per se but can become such only in the manner used depending upon the evidence shown."). The State was not required to prove that Hopper actually intended to cause serious bodily injury or death or that his hands actually caused serious bodily injury or death. See Tucker v. State, 274 S.W.3d 688, 691 (Tex.Crim. App.2008); McCain, 22 S.W.3d at 503; Brooks v. State, 900 S.W.2d 468, 472 (Tex. App.–Texarkana 1995, no pet.). As long as the totality of the evidence showed that Hopper's hands were capable of causing serious bodily injury or death in the manner Hopper used them, the jury was authorized to find that Hopper's hands qualified as a deadly weapon under Texas Penal Code section 1.07. See Tucker, 274 S.W.3d at 691; McCain, 22 S.W.3d at 503; Jefferson v. State, 974 S.W.2d 887, 892 (Tex. App.–Austin 1998, no pet.); see also Quincy v. State, 304 S.W.3d 489, 499–500 (Tex. App.–Amarillo 2009, no pet.) ("In determining whether an object is a deadly weapon, the jury may consider all the surrounding facts, including the defendant's words and whether the victim feared death or serious bodily injury."). The totality of the evidence that a fact-finder may consider in determining whether an object was used as a deadly weapon includes the physical proximity between the victim and the object, any threats or words used by the defendant, the manner in which the defendant used the object, testimony by the victim that she feared death or serious bodily injury, and testimony that the object had the potential to cause death or serious bodily injury. Brown v. State, 716 S.W.2d 939, 946 (Tex.Crim.App.1986); In re S.B., 117 S.W.3d 443, 446–47 (Tex.App.–Fort Worth 2003, no pet.).

 The evidence at trial revealed that Hopper attempted to impede the breathing of both Green and VanZant with his hands and that he hit them repeatedly with his hands and fists. When Hopper held his hand over Green's nose and mouth, she was afraid she would die and was in danger of losing consciousness. Hopper dragged Green out of his truck by her neck and attempted to "rip" her jaw off. Green had bruising and a bleeding lip after one of Hopper's attacks. Hopper's attacks on VanZant were even more brutal. Hopper grabbed VanZant around the throat to choke her, and VanZant could not breathe for a few seconds. Hopper was "wild," "mad," and cursed her while choking her. The second time Hopper strangled Van-Zant, she lost feeling in her arms, and her vision began to completely fade away before she was able to escape. Hopper had implied that he would kill her because she was a "snitch." VanZant's symptoms after this attack, including petechial hemorrhaging and bruising around her neck, were consistent with manual strangulation. VanZant testified that she believed she was going to die during these attacks.

Dusang, an expert in strangulation, testified that VanZant's and Green's injuries were consistent with being strangled and that Hopper, by impeding their airways with his hands, used his hands in a manner that was capable of causing serious bodily injury or death.

This quantum of evidence is sufficient to support the jury's deadly-weapon finding. *See, e.g., Lane,* 151 S.W.3d at 191–92 (holding evidence sufficient that hand was used as deadly weapon in assault because defendant hit victim with his fist, victim suffered a concussion and loss of consciousness, and experts testified that a closed fist striking a person's head could cause serious physical injury); *Brantley v. State,* No. 05–13–00225–CR, 2014 WL 545514, at *3 (Tex. App.–Dallas Feb. 10, 2014, no pet.) (mem. op., not designated for publication) (holding sufficient evidence supported deadly-weapon finding because defendant used his forearms to choke the victim, defendant straddled her to hit her in the face and head, and victim thought she was going to die or suffer serious bodily injury); *Quincy,* 304 S.W.3d at 500–01 (finding evidence sufficient to support hands-as-a-deadly-weapon finding because defendant was larger than victim, defendant grabbed victim around the throat causing bruising, defendant hit the victim in the head and back, and police officer testified that defendant used his hands as a deadly weapon based on victim's injuries); *Goode v. State,* No. 03–10–00254–CR, 2011 WL 477038, at *5 (Tex.App.–Austin Feb. 9, 2011, no pet.) (mem. op., not designated for publication) (holding evidence was sufficient to support conviction for family violence with a deadly weapon because victim's injuries were consistent with strangulation, victim testified she was afraid she would die, and expert testified hands are capable of causing

death or serious bodily injury); *Hemphill v. State,* No. 08–03–00054–CR, 2004 WL 722247, at *4–5 (Tex.App.–El Paso Apr. 1, 2004, pet. ref'd) (mem. op., not designated for publication) (holding evidence sufficient to support finding that defendant's hands were deadly weapon because defendant choked smaller victim, victim had bruised neck, victim believed she would die, and expert testified hands were capable of causing serious bodily injury); *cf. Judd v. State,* 923 S.W.2d 135, 140 (Tex.App.–Fort Worth 1996, pet. ref'd) (holding indictment allegation that defendant caused victim's death by choking her with his hand was sufficient notice that State would seek a deadly-weapon finding). Based on the rational inferences the jury could have drawn from the admitted evidence, the evidence is sufficient to show that Hopper used his hands in a manner that was capable of causing death or serious bodily injury. *See Petruccelli v. State,* 174 S.W.3d 761, 770 (Tex.App.–Waco 2005, pet. ref'd) (op. on reh'g), *cert. denied,* 549 U.S. 839, 127 S.Ct. 106, 166 L.Ed.2d 66 (2006). We overrule the remaining portion of Hopper's second point.

## III. ERROR IN THE JUDGMENT

The issue of Hopper's guilt or innocence was decided by a jury, but the trial court heard punishment evidence and assessed Hopper's punishment. The nunc pro tunc judgment[1] reflects that the jury found Hopper guilty and assessed his punishment. Although Hopper does not attack this portion of the trial court's judgment, we may modify a judgment sua sponte to reflect the truth of the underlying proceeding. *See* Tex.R.App. P. 43.2(b); *French v. State,* 830 S.W.2d 607, 609 (Tex. Crim.App.1992). Therefore, the judgment should be modified to reflect that the trial

---

1. The original judgment reflected that Hopper waived his right to a jury trial and that the trial court found Hopper guilty of the offense and assessed his punishment.

court assessed Hopper's punishment. *See* Tex.Code Crim. Proc. Ann. art. 42.01, § 1(8) (West Supp.2015).

## IV. CONCLUSION

Hopper did not preserve his complaints directed to the prosecutor's closing jury arguments or the constitutionality of article 42.12 as applied to his hands, and we conclude that the evidence was sufficient to support the jury's deadly weapon finding. Even so, we modify the judgment to reflect that the trial court assessed Hopper's punishment. As modified, we affirm the trial court's judgment. *See* Tex. R.App. P. 43.2(b).

DAUPHINOT, J. filed a dissenting opinion.

LEE ANN DAUPHINOT, JUSTICE, dissenting.

Because I believe the majority incorrectly analyzes the law and the evidence of the deadly weapon finding, I must respectfully dissent.

The indictment charged Appellant with continuous family violence against Sandra and Starla, women with whom he had dating relationships within a period of twelve months or less. He was accused of causing them bodily injury by hitting them and by impeding their breathing and of using and exhibiting his hands as a deadly weapon. He did not testify at trial. Appellant expresses his second point as

Appellant submits that there is insufficient evidence that he used a deadly weapon during the commission of the offenses in the indictment, and in the alternative, that the statute is unconstitutional in that the words "or exhibited" in relation to a defendant's hands violated the equal protection and due process clauses of the Constitution. Appellant seeks reformation of the judgment to eliminate the affirmative finding of a deadly weapon.

The indictment charged that Appellant committed continuous family violence. The indictment alleged that he committed the two underlying assaults "by hitting Starla ... in the face and arms with his hands and by impeding [her] breathing with his hands; and ... by hitting Sandra ... in her head with [his] hands and impeding [her] breathing with his hands[.]" The indictment further alleged that Appellant "did use or exhibit a deadly weapon during the commission of the offense, to wit: said defendant's hands, that in the manner of [their] use or intended use [were] capable of causing death or serious bodily injury."

Section 25.11 of the penal code provides that a person commits the third-degree felony offense of continuous family violence

if, during a period that is 12 months or less in duration, the person two or more times engages in conduct that constitutes an offense under Section 22.01(a)(1) against another person or persons whose relationship to or association with the defendant is described by Section 71.0021(b), 71.003, or 71.005.[1]

Section 22.01(a)(1) of the penal code provides that someone commits an assault by "intentionally, knowingly, or recklessly caus[ing] bodily injury to another, including the person's spouse[.]"[2] One way to commit an assault is to "intentionally, knowingly, or recklessly imped[e] the normal breathing ... of the person by applying pressure to the person's throat or neck or by blocking the person's nose or

---

1. Tex. Penal Code Ann. § 25.11(a) (West 2011).

2. *Id.* § 22.01(a).

mouth." [3] Appellant was charged with using his hands both to hit the complainants and to impede their breathing.

In order for the impeding of normal breathing to rise to a use or exhibition of a deadly weapon, there must be something more. The "something more" must be found in the mind or intent of the defendant, not just additional punishment. That is, there must be evidence that Appellant intentionally, knowingly, or recklessly impeded the normal breathing of the complainant and additional evidence that when he did so, he intentionally or knowingly used his hands as a deadly weapon. It is not sufficient that the evidence show that the complainant feared the possibility of death. A complainant's subjective belief is not sufficient to prove a defendant's intent.

Although caselaw insists that it is not necessary that the evidence show that the defendant intended to cause death when he used his hands in order to support a deadly weapon finding, the evidence must show that Appellant's wrongdoing in employing his hands as a deadly weapon was conscious and intentional in order to satisfy the basic principle of constitutional criminal law that "wrongdoing must be conscious to be criminal" and that a defendant must be "blameworthy in mind" before he can be found guilty.[4] The "general rule" is that a guilty mind is "a necessary element in the indictment and proof of every crime." [5]

Nonetheless, the Texas Court of Criminal Appeals and intermediate appellate courts of Texas have repeatedly brushed aside this fundamental tenet of constitutional law, repeating the mantra that "there is no additional requisite mental state attached to the aggravating element of use of the deadly weapon." [6] The Texas Court of Criminal Appeals addressed section 1.07(a)(17)(B) of the penal code in *McCain v. State* [7] and clarified its interpretation of the statute in a manner that appears to recognize the constitutional mens rea requirement:

> The provision's plain language does not require that the actor actually intend death or serious bodily injury; an object is a deadly weapon *if the actor intends a use* of the object in which it would be capable of causing death or serious bodily injury.[8]

An object is a deadly weapon if the actor intends a use of the object in which it would be capable of causing death or serious bodily injury.[9] Sandra testified that she and Appellant had a tumultuous relationship. He hit her and interfered with her breathing; she stabbed him in the arm and chest and pointed a firearm at him. She testified at trial,

**3.** *Id.* § 22.01(b)(2)(B), (b–1)(3).

**4.** *Elonis v. United States*, —— U.S. ——, 135 S.Ct. 2001, 2009, 192 L.Ed.2d 1 (2015) (citing *Morissette v. United States*, 342 U.S. 246, 252, 72 S.Ct. 240, 244, 96 L.Ed. 288 (1952)).

**5.** *United States v. Balint*, 258 U.S. 250, 251, 42 S.Ct. 301, 302, 66 L.Ed. 604 (1922).

**6.** See, *e.g., Butler v. State*, 928 S.W.2d 286, 287–88 (Tex.App.–Fort Worth 1996, pet. ref'd); *Peacock v. State*, 690 S.W.2d 613, 615–16 (Tex.App.–Tyler 1985, no pet.); *Pass v. State*, 634 S.W.2d 857, 860 (Tex.App.–San An-

tonio 1982, pet. refd); *see also Walker v. State*, 897 S.W.2d 812, 814 (Tex.Crim.App.1995); *Aaron v. State*, No. 02–12–00029–CR, 2013 WL 4507861, at *1 (Tex.App.–Fort Worth Aug. 22, 2013, pet. refd) (mem. op., not designated for publication).

**7.** 22 S.W.3d 497 (Tex.Crim.App.2000).

**8.** *Id.* at 503 (emphasis added).

**9.** Tex. Penal Code Ann. § 1.07(17) (West Supp.2015); *see Alvarado v. State*, 317 S.W.3d 749, 750–51 (Tex.App.–Beaumont 2010, pet. ref'd).

Q And tell me about—what did he do with his hands, just so I understand, Sandra?

A Put them around my throat.

Q And then he put[—]

A Pressure—putting pressure on my throat.

Q And what effect did that have on you, Sandra?

A It scared me.

Q Why?

A Because I couldn't breathe and I thought I was going to die.

Q And you—you say couldn't breathe. How long did that go on?

A *Only a few seconds.*

Q *But you said you felt like you were going to die?*

A *(Nods head up and down) I didn't know he was going to stop. I didn't know what was going to happen.*

Q And could you see his face while he was doing this?

A Yes.

Q And tell me what his face looked like.

A Wild. I don't know. Mad.

Q Was he saying anything while he was doing this to you?

A Yes. He was calling me stupid bitch and—

Q But you say that he—he let go of your neck after just a couple of seconds, right?

A Yes.

. . . .

Q All right. Were you able to get yourself put together?

A Best I could.

Q And then what happened?

A We both cried about it.

Q What do you mean, you cried about it?

A He—he apologized, said he was sorry.

. . . .

Q ... [D]id anything else violent happen that day?

A No.

Later in her testimony, Sandra said that her vision was "real blurry and blacking out" and that her breathing was obstructed for two or three minutes or for five or ten minutes; she could not tell. When asked to describe what she meant by blacking out, she said that it was "like closing in all the lights, it was like closing in."

Although Sandra did not feel that she could breathe in during this time, she was able to breathe out. That is, she could scream, and she testified that she "scream[ed] the whole time[,]" even while she was blacking out.

Starla testified that Appellant hit her in the face and arm and put one of his hands over her mouth and nose, preventing her breathing. She estimated that his hand was over her mouth and nose off and on over a period of a minute and a half. She testified that Appellant put his arm around her neck to drag her out of his truck and to pull her back into the bedroom.

A body of law has developed that appears to hold that anything can be a deadly weapon—walls, floors, pillows, water, and body parts. Appellant points out that [t]he *Rocha*[10] court stated that as used the term "deadly weapon" contemplates the situation in which the defendant uses a weapon or utilizes some other object as a weapon to augment the force of his physical assault. A weapon is some-

10. *United States v. Rocha*, 598 F.3d 1144 (9th Cir.2010).

thing with which one can "be armed," something one can pick up and use, for example: beer bottles, chairs, telephone receivers swung on a cord. The *Rocha* court stated that an increase in criminal liability occurs because the actor employed a device to assist in the criminal endeavor.

A function test or use-oriented approach analysis seeks to understand if an instrument is "dangerous"; not to be used as a guide to determine if the means by which the victim was injured was an "instrument." Finding feet and hands are deadly weapons makes the defendant both the perpetrator and the deadly weapon and creates ambiguity and duplication in regard to assault and the more serious charge of aggravated assault; a defendant need only display his hands or feet to support a deadly weapon finding. The court determined that it could not give independent meaning to the term "deadly weapon" if the mere use of a body part is a deadly weapon. The court stated that every defendant could be accused of assault using a body part in some way, if the assault is made with the intent to do bodily harm, without any independent showing of the use of a "deadly weapon." [11]

Appellant also contends that "the statute's use of the words 'or exhibited' in relation to a defendant's hands violates the equal protection and due process clauses of the Constitution". Making the exhibition of a body part a means of increasing punishment is nonsensical, and I am at a loss to understand how a person exhibits a body part as a deadly weapon. Appellant's argument is both cogent and persuasive. In its recent opinion in *Elonis*, the Supreme Court of the United States explained,

The fact that the statute does not specify any required mental state ... does not mean that none exists. We have repeatedly held that mere omission from a criminal enactment of any mention of criminal intent should not be read as dispensing with it. This rule of construction reflects the basic principle that wrongdoing must be conscious to be criminal. As Justice Jackson explained, this principle is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. The central thought is that a defendant must be blameworthy in mind before he can be found guilty, a concept courts have expressed over time through various terms such as mens rea, scienter, malice aforethought, guilty knowledge, and the like. Although there are exceptions, the general rule is that a guilty mind is a necessary element in the indictment and proof of every crime. We therefore generally interpret criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them.

This is not to say that a defendant must know that his conduct is illegal before he may be found guilty. The familiar maxim "ignorance of the law is no excuse" typically holds true. Instead, our cases have explained that a defendant generally must know the facts that make his conduct fit the definition of the offense, even if he does not know that those facts give rise to a crime.

. . . .

... Federal criminal liability generally does not turn solely on the results of an act without considering the defen-

---

11. Appellant's Brief at 29–30 (citations omitted).

dant's mental state. That understanding took deep and early root in American soil and Congress left it intact here: Under Section 875(c), wrongdoing must be conscious to be criminal.[12]

Appellant was charged with and convicted of either exhibiting or using his hands as a deadly weapon. Hands are not a deadly weapon per se; rather, their character as a deadly weapon depends on the defendant's use or intended use.[13] That character may not be determined by the complainant's opinion or a reasonable person's opinion.[14] Instead, it must lie in the defendant's guilty mind.[15] The only evidence of Appellant's use of his hands as a deadly weapon is the complainants' statements that he had put pressure on their necks for a couple of seconds, a few seconds, or some undetermined length of time.

Tiffanie Dusang, a forensic nurse examiner, testified to the distinction between choking and strangling.

> You know, the terms often get confused. But strangulation ... is intentional external pressure on the vessels, the air passages of the neck, whereas choking is accidentally obstructing the windpipe with food, or something along those lines.

She testified that it takes about four or five minutes to strangle someone to death. It takes ten seconds to lose consciousness. She also testified that Appellant's hands were capable of causing death or serious bodily injury as he used them but that he caused neither. This conclusion, however, contradicts her testimony that it takes four or five minutes to cause death. The record does not reflect that Appellant made any effort to impede the breathing of either woman for any extended period of time. Neither woman lost consciousness.

A woman may dunk her husband's head under water while they are swimming, either playfully or in anger. But the fact that he could drown if held under the water for an extended period of time does not mean that the woman used the water as a deadly weapon. It means she dunked her husband. The fact that it is possible to beat a person to death or to kick a person to death does not mean that a person who delivers a single punch or kick, or more than one, is necessarily using his hand or foot as a deadly weapon.

The legislature created the law that resulted in the deadly weapon issue being submitted to the trier of fact. The legislature created the statute dealing with impeding the breathing of the object of family violence. Had the legislature intended every instance of impeding breathing to be a "3g"[16] offense, the legislature was perfectly competent to write the statute in that manner. It has not. Instead, courts have improperly and "unnecessarily invade[d] the lawmaking province of the Legislature" to rewrite the statute themselves.[17]

We should hold that, under the facts of this case and under the law as enacted by the legislature, the evidence does not support a finding that Appellant used or exhibited his hands as a deadly weapon. Be-

---

12. 135 S.Ct. at 2009, 2012 (citations and internal quotations omitted).

13. *See* Tex. Penal Code Ann. § 1.07(17).

14. *See Elonis,* 135 S.Ct. at 2009, 2012.

15. *See id.; McCain,* 22 S.W.3d at 503; *Alvarado,* 317 S.W.3d at 750–51.

16. Tex.Code Crim. Proc. Ann. art. 42.12, § 3g (West Supp.2015).

17. *Boykin v. State,* 818 S.W.2d 782, 786 (Tex. Crim.App.1991).

cause the majority does not so hold, I must respectfully dissent.