

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

Nos. 04-20-00209-CR, 04-20-00210-CR, 04-20-00211-CR

Alfred Alan **GOODEMOTE**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 452nd District Court, Menard County, Texas
Trial Court Nos. 2019-02512, 2019-02513, 2020-02515
Honorable Robert Hoffman, Judge Presiding

Opinion by:    Irene Rios, Justice

Sitting:    Patricia O. Alvarez, Justice
Luz Elena D. Chapa, Justice
Irene Rios, Justice

Delivered and Filed: June 30, 2021

AFFIRMED

Appellant Alfred Goodemote ("Goodemote") appeals his convictions for aggravated assault with a deadly weapon, aggravated assault against a public servant, and retaliation against a public servant. Goodemote argues the evidence is legally insufficient to support his convictions on all three counts. Goodemote also argues the trial court abused its discretion when it disqualified a defense witness who violated Rule 614 of the Texas Rules of Evidence. We affirm the trial court's judgments.

BACKGROUND

In the early morning of August 20, 2019, law enforcement responded to a 911 call from Toby Goodemote ("Toby"). Toby and Goodemote were having an argument in their home. Jacy Overstreet, Toby's adult daughter who was living with the Goodemotes, overheard the argument from her room and became involved in the altercation. At some point, the exchange between Overstreet and Goodemote became physical and escalated, and Overstreet's head was slammed into a rock wall inside the home.

Deputy Coy Morales with the Menard County Sheriff's Department[1] was the first officer to respond. When Deputy Morales arrived, he discovered Goodemote standing in a dark room by himself with four or five knives in his hand. Deputy Morales attempted to persuade Goodemote to put the knives down when Deputy Jose Orsonio arrived to assist Deputy Morales. Shortly thereafter, Deputy Joseph Sevier and Deputy Connie Baker arrived at the scene to assist the other deputies. The deputies continued to ask Goodemote to drop the knives and deescalate the situation. At some point, Goodemote began running the blade over his body, cut his own calf, and pierced his right foot.

The deputies agreed Goodemote was not going to comply with their requests on his own volition and decided they would have to use a taser on Goodemote to neutralize the situation. Deputy Sevier walked into the room and shot his taser at Goodemote. Deputy Morales testified that only one of the taser prongs made contact and the taser did not take effect. After the first taser did not take effect, Deputy Orsonio stepped into the room to shoot a second taser at Goodemote. Deputy Orsonio testified Goodemote threw a knife at him when he stepped into the room. The thrown knife missed him and he shot his taser, which made contact with Goodemote and took

---

[1] All of the deputies that responded to this incident were with the Menard County Sheriff's Department.

effect. While Goodemote was subdued from the taser, the deputies moved in and placed him under arrest. Deputies Morales, Orsonio, and Baker testified that, during the arrest, Goodemote stated "he knew where all the cops lived[,] and he would kill [them]."

The State charged Goodemote with aggravated assault with a deadly weapon for striking Overstreet's head against the rock wall, aggravated assault with a deadly weapon against a public servant for throwing the knife at Deputy Orsonio, and retaliation against a public servant for threatening Deputy Baker. A jury convicted Goodemote on all three counts and assessed a punishment of ten years' confinement for the aggravated assault against Overstreet, thirty-five years' confinement for the aggravated assault against a public servant, and ten years' confinement for the retaliation charge.

## SUFFICIENCY OF THE EVIDENCE

In his first three issues, Goodemote challenges the legal sufficiency of the evidence to support each one of his three convictions.

### Standard of Review

When reviewing the sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018) (emphasis omitted). Under this standard, "we defer to the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010) (quotations omitted). "Furthermore, the trier of fact may use common sense and apply common knowledge, observation, and experience gained in ordinary affairs when drawing inferences from the evidence." *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014).

***Aggravated Assault with a Deadly Weapon***

The State charged Goodemote with aggravated assault with a deadly weapon for "striking" Overstreet's head into a rock wall during their altercation. The indictment notified Goodemote that the State intended to seek an affirmative finding that the rock wall was used in a manner that classifies it as a deadly weapon. In his first issue, Goodemote argues the evidence is insufficient to support his conviction for aggravated assault with a deadly weapon against Overstreet. Goodemote also contends the evidence is insufficient to support a finding that the rock wall was a deadly weapon.

A. *Aggravated Assault*

A person commits the offense of assault if the person "intentionally, knowingly, or recklessly causes bodily injury to another . . . ." TEX. PENAL CODE ANN.§ 22.01(a)(1). The offense is elevated to aggravated assault if the person "(1) causes serious bodily injury to another . . . ; or (2) uses or exhibits a deadly weapon during the commission of the assault." *Id.* § 22.02(a).

Here, Overstreet testified that her argument with Goodemote escalated into a physical altercation. Overstreet testified Goodemote put her in a headlock and, during the struggle, her head went into the rock wall. When asked whether Goodemote caused her head to hit the wall, Overstreet—who was compelled to testify under subpoena—initially stated she was unsure whether Goodemote caused her head to hit the rock wall when they were struggling. But, when asked again whether Goodemote "either intentionally or recklessly . . . caused [her] head to hit the wall[,]" Overstreet answered in the affirmative. Overstreet testified she experienced pain when her head hit the rock wall. The State introduced State's Exhibits 2, 3, and 5 and all three were admitted into evidence. Overstreet testified State's Exhibit 2 was a picture showing the cut she received on her head when it hit the rock wall. Overstreet testified State's Exhibit 3 was a picture

showing the red marks she received on her neck from the headlock Goodemote applied on her. Finally, Overstreet testified State's Exhibit 5 was a picture depicting the rock wall that her head hit during the altercation. Moreover, Deputy Morales testified Overstreet was in an excited state when he arrived at the Goodemote residence and she told him that Goodemote had slammed her head into the rock wall. Viewing the evidence in the light most favorable to the verdict, a rational factfinder could have determined that Goodemote intentionally, knowingly, or recklessly caused bodily injury to Overstreet by putting her in a headlock and causing her head to be slammed into a rock wall.

### B. *Deadly Weapon*

The Texas Penal Code defines a "deadly weapon" as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." TEX. PENAL CODE ANN. § 1.07(a)(17)(B). "Serious bodily injury" is defined as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46). The deadly weapon definition "is exceedingly broad in that a 'deadly weapon' may be 'anything,' and there is no limitation as to what type of thing may be considered a deadly weapon." *Prichard v. State*, 533 S.W.3d 315, 320 (Tex. Crim. App. 2017) (quoting TEX. PENAL CODE ANN. § 1.07(a)(17)(B)). Therefore, a wall may be a deadly weapon based on its manner of use or intended use and its capacity to produce death or serious bodily injury. *See, e.g.*, *Hopper v. State*, 483 S.W.3d 235, 243 (Tex. App.—Fort Worth 2016, pet. ref'd) (Dauphinot, J., dissenting) ("A body of law has developed that appears to hold that anything can be a deadly weapon—walls, floors, pillows, water, and body parts."). "A deadly weapon finding can be made even in the absence of actual harm or threat." *Prichard*, 533 S.W.3d at 320. In deciding whether an object is a deadly weapon, the jury may consider all of the facts including the physical proximity between the alleged victim and the object, any threats or words

used by the accused, the size and shape of the object, testimony about the weapon's potential to cause death or serious bodily injury, and the manner in which the object was used. *Kennedy v. State*, 402 S.W.3d 796, 802 (Tex. App.—Fort Worth 2013, pet. ref'd) (citing *Brown v. State*, 716 S.W.2d 939, 946–47 (Tex. Crim. App. 1986)). "No one factor is determinative, and each case must be examined on its own facts." *Bailey v. State*, 46 S.W.3d 487, 491–92 (Tex. App.—Corpus Christi-Edinburg 2001, pet. ref'd) (citing *Brown*, 716 S.W.2d at 946–47).

As mentioned above, the jury heard testimony that the rock wall was used by Goodemote to slam Overstreet's head into it. The jury was shown State's Exhibit 5, depicting the rock wall, so they may consider whether the rock wall was capable of causing death or serious bodily injury. The jury was also shown pictures of Overstreet's injuries resulting from the headlock and her head being slammed into the rock wall. After testifying a deadly weapon was anything capable of causing death or serious bodily injury, Deputy Morales testified the rock wall could be a deadly weapon. The jury was free to draw reasonable inferences from these basic facts to form an ultimate conclusion that the rock wall was used in a manner that rendered it a deadly weapon. *See Isassi*, 330 S.W.3d at 638 (holding a reviewing court defers to the factfinder's drawing of reasonable inferences from basic facts to ultimate facts in a legal sufficiency review); *see also Acosta*, 429 S.W.3d at 625 ("[T]he trier of fact may use common sense and apply common knowledge, observation, and experience gained in ordinary affairs when drawing inferences from the evidence."). Viewing the evidence in the light most favorable to the verdict, we conclude a rational jury could have determined the rock wall is a deadly weapon in this case because it is capable of causing serious bodily injury when someone strikes a person's head into it. Therefore, we hold the evidence in this case is sufficient to sustain Goodemote's conviction for aggravated assault with a deadly weapon against Overstreet. Accordingly, we overrule Goodemote's first issue.

*Aggravated Assault Against a Public Servant*

The State charged Goodemote with aggravated assault against a public servant for throwing a knife at Deputy Orsonio when he stepped into the room to fire his taser at Goodemote. The indictment notified Goodemote that the State intended to seek an affirmative finding that the knife was used in a manner that classifies it as a deadly weapon and that Deputy Orsonio was a public servant lawfully discharging his official duty when Goodemote threw the knife at him. In his second issue, Goodemote argues the evidence is insufficient to support his conviction for aggravated assault against Deputy Orsonio. Goodemote also argues the evidence is insufficient to support a finding that the knife was a deadly weapon.[2]

"Ordinarily, to sustain a conviction for aggravated assault of a public servant the evidence must demonstrate that:" (1) "the person intentionally or knowingly threatened another with imminent bodily injury," (2) "the person used or exhibited a deadly weapon during the commission of the assault, and" (3) "the offense was committed against a person the actor knew was a public servant while the public servant was lawfully discharging an official duty." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see also* TEX. PENAL CODE ANN. § 22.01(a)(2), 22.02(a)(2), (b)(2)(B).

"[A] knife is not a deadly weapon per se . . . ." *Rivera v. State*, 271 S.W.3d 301, 304 (Tex. App.—San Antonio 2008, no pet.). However, a knife can qualify as a deadly weapon "through the manner of its use, its size and shape[,] and its capacity to produce death or serious bodily injury." *Id.* "But if a knife did not cause serious bodily injury or death, to qualify as a deadly weapon the evidence must prove 'the actor intended a use of the knife in which it would be **capable** of causing death or causing serious bodily injury.'" *Id.* (alterations omitted) (emphasis in original)

---

[2] Goodemote does not contest Deputy Orsonio's status as a public servant in his brief; therefore, we do not address that element here.

(quoting *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000)). "[W]hether a particular knife is a deadly weapon depends upon the evidence." *Rivera*, 271 S.W.3d at 305. "The State may establish the knife was capable of causing death or serious bodily injury through witnesses' descriptions of the knife's size, shape, and sharpness; testimony of the knife's life-threatening capabilities; the manner in which the knife was used; the words spoken by the defendant; the physical proximity between the victim and the knife; and the nature of any wounds caused by the knife." *Id.* at 304.

Here, Deputy Orsonio testified Goodemote threw a knife at him when he stepped into the room to fire the taser at Goodemote. Although Deputy Orsonio was not able to identify the exact knife that was thrown at him—because "[t]he incident happened quick" and Goodemote held five different knives in his hand prior to the throw—Deputy Orsonio did testify that it was one of the two larger knives held in Goodemote's right hand. State's Exhibit 6, depicting three small knives and two larger knives, was admitted into evidence and published to the jury. All five knives were also admitted into evidence so the jury could assess the size, shape, and sharpness of the two larger knives to determine whether they were capable of causing death or serious bodily injury. Deputy Morales testified Goodemote was "very angry" and "very agitated." Deputy Morales further testified that all five knives held by Goodemote were capable of causing death or serious bodily injury and were, therefore, deadly weapons. Defense counsel argued in closing that the knife left Goodemote's hand involuntarily after he was tased, but Deputy Orsonio testified Goodemote purposefully threw the knife at him like a dart. Deputy Sevier, who fired the first taser and was in the room with Deputy Orsonio, testified he saw Goodemote throw the knife at Deputy Orsonio. Deputy Sevier further testified he believed Goodemote purposefully threw the knife at Deputy Orsonio and Deputy Orsonio had to dodge the knife to avoid being struck by it.

Based on this evidence, a rational factfinder could have found beyond a reasonable doubt that Goodemote used either one of the larger knives in a way that would be capable of causing serious bodily injury. Further, when we view the evidence in the light most favorable to the verdict, we conclude a rational jury could have found Goodemote intentionally or knowingly threatened Deputy Orsonio with imminent bodily injury by throwing a knife at him while he was discharging his official duty as a Menard County Sheriff's Deputy. Therefore, we hold the evidence in this case is sufficient to sustain Goodemote's conviction for aggravated assault against a public servant. Accordingly, we overrule Goodemote's second issue.

### Retaliation Against a Public Servant

In his third issue, Goodemote contends the evidence is insufficient to support his conviction for retaliation against a public servant under Subsection 36.06(c) of the Texas Penal Code. Goodemote argues Subsection 36.06(c) of the Texas Penal Code only pertains to victims that are jurors, or when the retaliation resulted in injury to a public servant or a member of her family. Goodemote's argument follows that the evidence is legally insufficient to support a conviction under this statute because neither situation occurred in this case. However, Goodemote's arguments are without merit. Subsection 36.06(c) simply designates retaliation as a third-degree felony and enhances the crime to a second-degree felony if the retaliation was against a juror or the retaliation resulted in an injury to a public servant or a member of the public servant's family. TEX. PENAL CODE ANN. § 36.06(c). Here, the State indicted Goodemote under Subsection 36.06(a)(1) of the Texas Penal Code, not Subsection 36.06(c). Subsection 36.06(a)(1) states: "A person commits an offense if the person intentionally or knowingly harms or threatens to harm another by an unlawful act[] in retaliation for or on account of the service or status of another as a[] public servant . . . ." *Id.* § 36.06(a)(1)(A). The State's indictment charged Goodemote as follows:

ALFRED ALAN GOODEMOTE, hereafter styled the Defendant, heretofore on or about August 20, 2019, did then and there intentionally or knowingly threaten to harm another, to-wit: Connie Baker, by an unlawful act, to-wit: threaten to kill the said Connie Baker, in retaliation for or on account of the status of Connie Baker as a public servant, to-wit: a Menard County Sheriff's Deputy.

Because Goodemote was charged and convicted of the third-degree felony of retaliation under Subsection 36.06(a)(1), Goodemote's sufficiency arguments under Subsection 36.06(c) are inapplicable.

"A person commits the felony offense of retaliation if he intentionally or knowingly harms or threatens to harm another by an unlawful act in retaliation for the service or status of another as a public servant . . . ." *Cada v. State*, 334 S.W.3d 766, 770 (Tex. Crim. App. 2011); *see also Doyle v. State*, 661 S.W.2d 726, 727–29 (Tex. Crim. App. 1983) (holding evidence was sufficient to convict defendant for the offense of retaliation under Section 36.06 where defendant verbally threatened to kill a judge); *Rudolph v. State*, 70 S.W.3d 177, 179 (Tex. App.—San Antonio 2001, no pet.) (affirming conviction for retaliation where defendant verbally threatened to kill a prospective witness); *Helleson v. State*, 5 S.W.3d 393, 394–95 (Tex. App.—Fort Worth 1999, pet. ref'd) (determining evidence that defendant verbally threatened to kill police officer was sufficient to convict defendant for the offense of retaliation under Section 36.06).  The State had the burden to prove beyond a reasonable doubt that Goodemote intentionally or knowingly threatened to kill Deputy Baker in retaliation for, or on account of, her service or status as a public servant.  *Cada*, 334 S.W.3d at 770.

Here, Deputy Morales testified Goodemote was resisting arrest as the deputies were trying to put handcuffs on him, and—during the struggle—Goodemote said to the deputies: "I know where all of y'all live, and I'm going to come kill y'all."  Deputy Orsonio corroborated Deputy Morales's testimony.  Deputy Orsonio testified, "after [Goodemote] was subdued and placed in handcuffs, he [said] he knew where all the cops lived and he would kill us."  Deputy Baker testified

she heard Goodemote say, "I know where you—all you cops live, and I'm going to kill you all." Deputy Baker further testified that she took the threat seriously because Goodemote "has a history of assaultive nature" and Goodemote likely did know where Deputy Baker lived. There was no evidence presented at trial that controverted the deputies' testimony regarding Goodemote's statement. Finally, Deputy Baker also testified that she was a Menard County Sheriff's Deputy— a public servant—on August 20, 2019, and still holds that position.

The jury was entitled to believe the deputies' testimony, which was consistent in all important respects. Based on this evidence, a rational factfinder could have found that Goodemote's statement was a threat to harm Deputy Baker. Further, the jury heard testimony that Goodemote aimed this threat directly to the "cops." A rational jury could have drawn the reasonable inference that the threat was made to the "cops" in retaliation for or on account of Deputy Baker's service as a public servant. Viewing the evidence in the light most favorable to the verdict, we conclude a rational factfinder could have found the essential elements of retaliation under Subsection 36.06(a)(1) beyond a reasonable doubt. *See* TEX. PENAL CODE 36.06(a)(1); *see also Nisbett*, 552 S.W.3d at 262. Therefore, we conclude the evidence in this case is sufficient to support Goodemote's conviction for retaliation. Accordingly, we overrule Goodemote's third issue.

### DISQUALIFICATION OF A DEFENSE WITNESS

In his fourth issue, Goodemote alleges the trial court abused its discretion when it disqualified his wife, Toby, from being a witness because she violated Rule 614 of the Texas Rules of Evidence (the "Rule"). The Rule provides for the exclusion of witnesses from the courtroom during trial. *See* TEX. R. EVID. 614. "The purpose of the Rule is to prevent corroboration, contradiction, and the influencing of witnesses." *Jimenez v. State*, 307 S.W.3d 325, 334 (Tex. App.—San Antonio 2009, pet. ref'd). "When the Rule is invoked, a witness should not hear

testimony in the case or talk to any other person about the case without the court's permission." *Id.* "[T]he court's decision regarding a witness who has violated the Rule is discretionary." *Id.* "[W]hen the Rule is violated, the trial court may, taking into consideration all of the circumstances, allow the testimony of the potential witness, exclude the testimony, or hold the violator in contempt." *Id.*

When the trial court decides to exclude a defense witness for violating the Rule, we apply the following analysis:

> (1) [I]f the [R]ule was violated and the witness disqualified, were there particular circumstances, other than the mere fact of the violation, which would tend to show the defendant or his counsel consented, procured or otherwise had knowledge of the witness's presence in the courtroom, together with knowledge of the content of that witness's testimony; and (2) if no particular circumstances existed to justify disqualification, was the excluded testimony crucial to the defense.

*Webb v. State*, 766 S.W.2d 236, 244–45 (Tex. Crim. App. 1989); *see also Jimenez*, 307 S.W.3d at 334–35 (applying Webb analysis when trial court disqualified witness for discussing case with defendant prior to testimony); *Brumbelow v. State*, 10 S.W.3d 685, 687–88 (Tex. App.—Tyler 1994, pet. ref'd) (undergoing *Webb* analysis when violation of the Rule was due to two witnesses discussing the case outside of court). We review the trial court's ruling to disqualify a defense witness for an abuse of discretion. *Webb*, 766 S.W.2d at 244.

Here, the Rule was invoked before opening statements and the trial court admonished the witnesses, including Toby, that they "may not be present in the courtroom while testimony is being taken" and "must not speak . . . with any other person" about the case except the attorneys involved. The trial was conducted over two days, and the State presented all its witnesses on the first day of trial. On the second day of trial, the State presented the trial court with an audio recording of a jailhouse call between Goodemote and Toby where they were discussing details of the testimony presented the day before. Specifically, Toby and Goodemote discussed details about

Overstreet's testimony and each of the deputies' testimony. It is apparent from the recording, which was admitted into evidence, that Toby had already discussed the case with Overstreet and Goodemote's father. Overstreet was one of the State's witnesses who was also under the Rule, and Goodemote and his father were present during the State's case in chief the day before. Goodemote also told Toby several times not to forget to mention the "noose" when she testifies. The State objected to Toby's appearance as a witness because she "flagrantly" violated the Rule by speaking with Goodemote, Goodemote's father, and Overstreet about the case. After hearing arguments, and considering other alternatives to disqualifying the witness, the trial court sustained the State's objection and disqualified Toby from testifying in the guilt/innocence phase of the trial.[3]

The trial court acknowledged Goodemote and Toby were both aware of Toby's obligations under the Rule and Toby affirmed her understanding of her obligations when questioned by the trial court. Even though Toby knew the Rule precluded her from speaking to anyone about the trial, she discussed the case with Goodemote, Overstreet, and Goodemote's father. Toby clearly and knowingly violated the Rule by speaking with these people about the trial.

In sum, "particular circumstances" existed, other than the mere fact of the violation, to justify Toby's disqualification as a witness. Goodemote consented, procured, and had knowledge that Toby was violating the Rule. Goodemote knew Toby was under the Rule but called Toby to discuss the case and was, therefore, a crucial proponent to Toby's violation of the Rule. Moreover, Goodemote instructed Toby that she should discuss the "noose" in her testimony. Therefore, the trial court did not abuse its discretion by disqualifying Toby as a witness because Goodemote consented to or procured Toby's violation of the Rule. *See Jimenez*, 307 S.W.3d at 334–35

---

[3] Toby was permitted to testify at the punishment phase of the trial.

(holding defense witness was properly excluded when the State presented a recording of the defendant and witness discussing the trial while the Rule was invoked). Accordingly, we overrule Goodemote's fourth issue.

**CONCLUSION**

The judgments of the trial court are affirmed.

Irene Rios, Justice

DO NOT PUBLISH