

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-19-00203-CR

———————————————————

DAVID MAX BURGESS JR., Appellant

V.

THE STATE OF TEXAS

On Appeal from the 90th District Court
Young County, Texas
Trial Court No. 10988

Before Kerr, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

A jury convicted appellant David Max Burgess Jr. of intentional bodily injury to an elderly individual and found true that he had used or exhibited a deadly weapon—his hands—during the commission of the offense. *See* Tex. Penal Code Ann. § 22.04. The trial court sentenced him to 15 years' confinement. In his sole issue on appeal, Burgess argues that the evidence is insufficient to support the jury's deadly-weapon finding. Because the evidence is sufficient to support that finding, we will affirm.

## I. Background

This case involves Burgess's assault of his 69-year-old aunt, Martha Moody, on her property in Newcastle. Seven witnesses testified at trial regarding the assault. Their testimonies are summarized below.

### A. Sheriff Travis Babcock

Young County Sheriff Travis Babcock testified that on the day of the assault, he received a call about a potential assault against Moody. He then drove to Moody's property, where Moody told him about the assault. Moody told him that Burgess had driven up to her property, that she had gone out to greet him, that she had made a comment about Burgess's "being high," and that Burgess had gotten angry and "grabbed her around the neck and pushed her down" to the ground. Babcock testified

that Moody had "red marks" on the left side of her chest, but he could not recall any other signs of injury.[1]

## B. Jerry Dollins

Jerry Dollins testified that he had lent Burgess a vehicle that Burgess was interested in purchasing. On the day of the assault, Dollins saw the vehicle go by while he was at a store, and, wanting to speak to Burgess about the vehicle, Dollins headed to Moody's property. Dollins testified that at the property, he saw Burgess arguing with Moody, saw Burgess shove Moody in the chest, and saw Moody fall backwards. Dollins testified that he "thought [Moody] might have hit her head, but . . . she didn't sit down long." Dollins stated that "two [or] three" people helped Moody get up after Burgess shoved her. Dollins testified that Burgess was "upset" at the scene of the assault and that Burgess made threats to those at the scene "not to testify." According to Dollins, Burgess also threatened to "shoot anyone who was going to interfere with his day."

## C. Moody

Moody—the victim and Burgess's aunt—testified that she had helped take care of Burgess and his sister when they were younger and that Burgess resided with her "[o]ff and on." She stated that she had "had stents put in [her] heart" before the day

---

[1]Two photographs purporting to show these marks were admitted into evidence. The marks are not readily apparent from the photographs. Babcock admitted that the photographs were not "the best" but reiterated that he saw red marks on Moody in person.

of the assault and that she had been out of the hospital for "[m]aybe a week" when she was assaulted. Moody testified that when Burgess arrived at her property that day, he was driving erratically, "almost hit[ting] [her] neighbor's fence when he came in," "almost hit[ting] the clothesline pole," and putting "ruts" in the yard. Moody then approached Burgess and accused him of being "high." According to Moody, Burgess then got out of his vehicle, slapped her neck, grabbed her neck "in a strangling motion," and then pushed[2] her onto the asphalt driveway.[3] Moody stated that Burgess called her a "lying bitch" during the assault. She testified that she "felt pain" and "had lost a good bit of skin through this"—on her elbows, the back of her neck, and on her knees.

Moody testified that neighbors across the street—Krystal Stucker and Lyn Otts—arrived on the scene and that Stucker helped her get up. Moody stated that Burgess then drove off erratically and that she was "afraid [she] was going to get hit with the car."

---

[2]On cross-examination, Moody stated that she had told police that Burgess had pushed her down before "choking" her, while at trial she said that Burgess had grabbed her by the neck and then pushed her to the ground.

[3]Moody initially testified that she was "almost positive [she] fell . . . directly on [her] back" but later clarified that she "hit [her] knees first before [she] went backwards."

## D. Stucker

Stucker testified that she and her mother, Otts, lived next door to Moody. Stucker was inside her home when she heard yelling coming from Moody's property. She went outside to investigate and saw Burgess grab Moody by the throat and push her "hard," knocking her down to the asphalt ground. Stucker testified that Moody "went down on her butt first and then back on her elbows and the back and hit her head." After briefly going back into her home to get her shoes, Stucker walked over to Moody's property and helped get Moody up off the ground. Stucker testified that Moody was "dazed"—"[s]he wasn't . . . knocked out, but she wasn't all herself either." Stucker stated that Moody was "pretty banged up" and had gravel marks on her elbows. Stucker also stated that Burgess told her that she needed to mind her own business, that he was "cussing,"[4] and that he "chest-butted" her. Stucker testified that Burgess then got into his car, spun it around, and drove off, knocking down a clothesline pole.

## E. Otts

Otts testified that on the day of the assault, she was sitting at her kitchen table in her home next door to Moody's when she heard "a lot of racket outside." She then went outside, and Stucker and Moody told her to call the sheriff "on [Burgess]." Otts then contacted law enforcement.

---

[4]Although Stucker testified that Burgess said "a bunch of profanities and nasty things," she could not recall Burgess's saying anything threatening.

## F. Chief Deputy John Orr

John Orr testified that he was the Chief Deputy for the Young County Sheriff's Office. On the day of the assault, Babcock notified Orr of a potential assault at Moody's property, and he and Babcock arrived at the scene around the same time. When he got there, Orr met with Moody, who was "shaking," "looked scared," and "seemed pretty frail." Moody told him that Burgess had "grabbed her around the neck, choked her, and then . . . struck her on her face, which knocked her down," causing her pain. Orr testified that he saw "marks on the right side of [Moody's] face and that she had redness on her chest and neck area."[5] Orr stated that he was concerned that Moody could have broken a hip from being pushed to the ground. Orr testified that Burgess's use of his hands during the assault could be considered use of a deadly weapon and could have been capable of causing death or serious bodily injury to Moody.

## G. Burgess

Burgess testified that he had moved out of Moody's home roughly two weeks before the assault. Burgess said that he went to Moody's home that day to retrieve his clothes. He stated that Moody was on the patio when he got there and that she accused him of being "high." According to Burgess, he told Moody that he was just there to get his clothes, and she "c[a]me at [him] and got physical," so he turned back

---

[5]Orr stated that he did not notice these marks at first but saw them after Moody described the assault.

to get into his vehicle. Burgess testified that Moody followed him to his vehicle and that she began "hitting [him] all from behind." Burgess denied striking Moody, denied grabbing Moody's neck, denied choking Moody, and denied shoving her to the ground.

## II. Discussion

In his sole issue, Burgess argues that the evidence is insufficient to support the jury's finding that he used or exhibited a deadly weapon during the assault.

### A. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light

most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

## B. The Law Regarding Deadly Weapons

A deadly weapon is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code Ann. § 1.07(a)(17)(B). A hand may be a deadly weapon based on its manner of use or intended use and its capacity to produce death or serious bodily injury. *Hopper v. State*, 483 S.W.3d 235, 239 (Tex. App.—Fort Worth 2016, pet. ref'd). A person need not have intended to cause serious bodily injury or death or to have actually caused serious bodily injury or death for his hand to constitute a deadly weapon. *Id.* As long as the totality of the evidence shows that the defendant's hand was capable of causing serious bodily injury or death in the manner that he used it, the jury is authorized to find that his hand qualified as a deadly weapon. *Id.*

Evidence that a factfinder may consider in determining whether an object was used as a deadly weapon includes the physical proximity between the victim and the object, any threats or words used by the defendant, the manner in which the defendant used the object, testimony by the victim that he or she feared death or

serious bodily injury, and testimony that the object had the potential to cause death or serious bodily injury. *Id.*

## C. Application of the Law to the Facts

The jury heard evidence that at the time of the assault, Moody was a "pretty frail" 69-year-old woman who had recently gotten out of the hospital following a heart-stent procedure. The jury further heard evidence that during the assault, Burgess slapped Moody, grabbed her around the neck "in a strangling motion," choked her, and pushed her "hard" to the asphalt ground, where she hit her knees, back, and head.[6] The jury also heard evidence that the assault caused Moody to suffer pain; that she was "dazed" and "pretty banged up"; that she had "lost a good bit of skin" on her elbows, neck, and knees; and that she had red marks on her face, neck, and chest. The jury further heard testimony that Moody was "shaking" and "looked scared" after the assault. Finally, the jury heard testimony from Orr that Burgess's use of his hands during the assault could be considered use of a deadly weapon and could have been capable of causing death or serious bodily injury to Moody.

Viewed in the light most favorable to the verdict, a rational juror could have concluded that Burgess used a deadly weapon when assaulting Moody. *See Quincy v.*

---

[6]In his brief, Burgess assails Moody's credibility, referring to some of her testimony as "lies." As noted earlier, the factfinder alone—in this case, the jury—judges the evidence's credibility, and we may not act as a thirteenth juror, re-evaluating the weight and credibility of the evidence and, thus, substituting our judgment for that of the factfinder. *Queeman*, 520 S.W.3d at 622; *Schiffert v. State*, 257 S.W.3d 6, 14 (Tex. App.—Fort Worth 2008, pet. ref'd) (op. on reh'g).

*State*, 304 S.W.3d 489, 500–01 (Tex. App.—Amarillo 2009, no pet.) (holding that evidence showing appellant grabbed victim's throat with his hand, struck victim on the head with a closed fist causing her to fall into a pantry, and punching the victim after she fell, was sufficient to prove he used his hands as a deadly weapon); *Zesati v. State*, No. 08-99-00171-CR, 2001 WL 1326898, at *4 (Tex. App.—El Paso Oct 25, 2001, no pet.) (not designated for publication) (holding that evidence showing appellant threw a 75-year-old woman to the floor and struck her with his fist was sufficient to prove he used his hands as a deadly weapon). Accordingly, the evidence is sufficient to sustain the jury's deadly-weapon finding. *See Jackson*, 443 U.S. at 316, 99 S. Ct. at 2787; *Queeman*, 520 S.W.3d at 622. We thus overrule Burgess's sole issue.

### III. Conclusion

Having overruled Burgess's sole issue, we affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  August 12, 2021